### In re WILLOW LAKE PARTNERS II, L.P.

**Bankruptcy No. 93–50231.**

United States Bankruptcy Court,
W.D. Missouri.

July 28, 1993.

Donald Bucher, Moore, Bucher & Morrison, Kansas City, MO, for Tri State, Pohrer and Brune.

Robert A. Pummill, Barker, Rubin & Pummill, P.C., Kansas City, MO.

Peter DeLanoit, Smith, Gill, Fisher & Butts, Kansas City, MO, for Willow Lake.

*AMENDED MEMORANDUM OPINION*

ARTHUR B. FEDERMAN, Bankruptcy Judge.

An involuntary Chapter 11 petition was filed against this debtor on May 4, 1993. The debtor controverted this petition pursuant to 11 U.S.C. § 303(h) on May 28, 1993. A hearing was held on June 18, 1993. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) over which the Court

has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find that petitioners have failed to prove that claims in the aggregate of at least $5,000 are not subject to a bona fide dispute, and therefore the involuntary petition must be dismissed.

### FACTUAL BACKGROUND

This involuntary petition results from a larger dispute between, on the one hand, David L. Johnson ("Johnson"), and on the other, Peter S. Brune ("Brune") and James E. Pohrer ("Pohrer"). These gentlemen are and have been partners in a number of real estate projects in the greater Kansas City area, one of which is Willow Lake Partners II, L.P. ("Willow Lake"). Typically, Brune and Pohrer acted as developers, while Johnson acted as property manager after the projects had been built or purchased.

As to Willow Lake, such partnership was formed on December 20, 1989. At that time, Willow Lake purchased an apartment complex from a partnership owned by Brune, Pohrer, and Tri–State Realty Investors of K.C., Inc. ("TSR"), a Missouri corporation controlled by Brune, Pohrer, and Johnson. The bulk of the equity for the purchase came from Boston Financial Qualified Housing Tax Credits, L.P. III, a Delaware limited partnership ("Boston"), which contributed $2,130,700. Boston was designated as the investor limited partner in Willow Lake, and, in effect, owned ninety-nine percent of the partnership.

The remainder of the purchase price came from a loan by Krupp Mortgage Company Limited Partnership (the "Mortgagee") in the amount of $2,850,000. The monthly payment on such loan is $22,878. Section 6.8 of the Agreement of Limited Partnership (the "Partnership Agreement") required the general partners of Willow Lake, who are Brune, Pohrer and TSR, to make Development Advances to the partnership to cover operating deficits prior to the Breakeven Date. Def.Exh. 1. These

Development Advances were to bear no interest and were to be repayable only to the extent that the project had cash flow ("Designated Proceeds") available for repayment but, if not fully repaid by the Breakeven Date were not to be considered capital contributions or loans to the partnership and were nonreimbursable. Prior to the final closing, $275,000 was placed in escrow accounts to be available to cover deficits occurring prior to the Breakeven Date. At the same time, Johnson caused a local bank to issue a $125,000 irrevocable letter of credit, secured by two certificates of deposit, as additional collateral for the Mortgagee in the event Willow Lake defaulted on its mortgage. That letter of credit was in fact drawn on December 3, 1992. The partnership agreement states that any loans to the defendant require the consent of Boston, and that the general partners "shall not have any authority ... to incur indebtedness for money borrowed on the general credit of the partnership ..." *Id.* at Art. 6 § 6.1(B)(i).

The managing agent for Willow Lake from the outset was Management Associates Investors, predecessor-in-interest to Maxus, L.P. ("Maxus"). Maxus is one of the petitioning creditors in this case. The limited partners of Maxus are Brune, Pohrer, and Johnson. The percentage ownership interests of Maxus are currently in dispute, but in 1989, Brune and Pohrer owned 50.5% and Johnson owned 49.5%. DLJ Enterprises, Inc. ("DLJ") is the managing general partner of Maxus, and Johnson is the president of DLJ. The management agreement between Willow Lake and Management Associates Investors was assigned to the Mortgagee on December 20, 1989.

The original property management agreement was to expire on November 30, 1990, and called for automatic one year renewals unless either party elected to terminate the agreement sixty days prior to the expiration.[1] This is the management agreement which was assigned to the Mortgagee. Such agreement provided that in

---

**1.** There is a subsequent management agreement which is identical to the original except the

effective dates are November 1, 1988 until October 31, 1990. Def.Exh. # 13.

the event of termination prior to the expiration, Maxus would be entitled to eighty percent of the fee that would have accrued over the remaining term of the management agreement. Def.Exh. # 11 at ¶ 7.0.

On November 1, 1990, a new management agreement was signed by Johnson on behalf of both Willow Lake and Maxus. Def.Exh. # 4. The agreement was for a term of ten years and continued the same eighty percent fee in the event of termination. No approval was obtained from the Mortgagee with respect to that new agreement. A dispute exists as to the validity of this new management agreement.

From its inception, Willow Lake has suffered losses virtually every month. Other projects involving these same individuals were also bleeding during this time, contributing to the deteriorating relationship between Johnson, and Brune and Pohrer. In October of 1992, Johnson issued a capital call for Maxus. In response Brune and Pohrer asked Johnson for an accounting as to Maxus. Brune and Pohrer contend that the accounting was not provided and that Johnson attempted to use their failure to make the capital call to dilute their interest and gain control of Maxus. On March 8, 1993, Brune and Pohrer attempted to remove Johnson from control of Maxus. Thereafter, on April 1, 1993, Brune and Pohrer, as general partners, acting in conjunction with Boston, sent a letter formally terminating Willow Lake's management agreement with Maxus and tendering a termination fee in the amount of $10,375.13, as calculated pursuant to the original management agreement. Def.Exh. # 22. That check was cashed by Maxus. Johnson, on behalf of Maxus, contends that such termination fee must be calculated based on the extended term of the 1990 agreement and that the amount due to Maxus is instead $144,057.60.

On April 2, 1993, Boston caused the partnership agreement to be amended to admit its subsidiary B.F. Willow Lake, Inc., a Massachusetts corporation ("BF"), as the managing general partner. Def.Exh. # 2. The amendment also converted the general partner interests of Brune, Pohrer, and TSR to Special Limited Partners. BF then attempted to enter the property to collect rents due that date and to assume management of the property. Maxus refused to relinquish possession of the premises or the books and records of the defendant to BF. BF then caused First National Bank of Platte City to freeze Willow Lake's bank account. There was testimony that defendant had between $30,000 to $35,000 in its account on May 1, 1993. Between April 2, 1993, and April 28, 1993, Maxus issued five checks to various creditors of defendant which the bank refused to clear because of the ongoing dispute as to who controlled Willow Lake.

On April 27, 1993, Willow Lake, acting through BF, filed suit in the Circuit Court of Platte County, Missouri against Maxus for an accounting and injunctive relief, or, in the alternative, the appointment of a receiver. Def.Exh. # 16. Willow Lake claims in its petition that Maxus has failed to apply the collection of rent and proceeds from the tenants of Willow Lake to its monthly mortgage payments and operating expenses. *Id.* An Order was issued in the Platte County action on April 28, 1993, stating that the parties agreed to the issuance of a permanent injunction if Willow Lake posted a bond in the sum of $212,000 as security for Maxus in the event Willow Lake was found liable under the management agreement. Willow Lake posted such bond that same date. Maxus vacated the premises and turned over all books and records to BF on April 28, 1993. The action in Platte County Circuit Court is now pending.

On April 12, 1993, Brune, Pohrer, and TSR filed a petition in the Circuit Court of Jackson County, Missouri against, among others, Johnson and Maxus. Such suit concerns control of Maxus as well as eight limited partnerships in which TSR and/or a Johnson entity, were, or are, the general partners. The parties all consented to a temporary restraining order and the appointment of a receiver for the eight properties. Def.Exh. # 24. The question of the exact ownership interests in Maxus, and, thus, who controls Maxus, is also now pending.

This involuntary Chapter 11 case was initiated on May 4, 1993, by four petitioning creditors. As noted, Maxus is one of the four petitioning creditors. Johnson himself is the second petitioning creditor. He contends that he personally advanced $35,000 to Willow Lake, Pl.Exh. # 2, and that Willow Lake owes him $125,000 in repayment of two certificates of deposit posted as collateral for the letter of credit drawn on by the Mortgagee.

The other two petitioning creditors are small accounts solicited by Johnson to participate in the bankruptcy. Beneficial Lighting, Inc., ("Beneficial") was owed $135.33 on the petition date, May 4, 1993. However, BF took over the management of the project and issued a check to this creditor on April 30, 1993. Beneficial's own records show that the invoice was paid on May 7, 1993. Beneficial refused to comply with defendants' discovery requests and its representative, Jerry White, was subpoenaed to the trial. He testified that Beneficial wished to withdraw as a petitioning creditor because it had been paid in full.

The final petitioning creditor, Summit Carpet Care ("Summit"), is owed $170. Jeff Shireman, the president of Summit, testified that Johnson advised him he should join in the involuntary petition for the purpose of preventing the replacement of Maxus as the management agent. Summit did work for Johnson on Willow Lake as well as other projects. Shireman also testified that he felt certain he would be paid for his work in any event.

In addition to Willow Lake, the petition named as defendants Brune, Pohrer, and TSR, based on an erroneous assumption that these were still the general partners of debtor. These defendants were dismissed by the Court at the close of petitioners' case, reserving any right they may have to pursue damages for being included in the case. 11 U.S.C. § 303(i).

## DISCUSSION

The issue in this case is whether the claims of Johnson and Maxus are subject to a bona fide dispute. Section 303(b) of the Bankruptcy Code provides, in relevant part, as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims....

11 U.S.C. § 303(b). Thus, if the claims of Johnson and Maxus are subject to a bona fide dispute, the remaining two petitioners cannot commence this involuntary bankruptcy because their claims in the aggregate are less than $5,000.

Case law defines "bona fide dispute" as a conflict in which an assertion of a claim or right is made in good faith, without fraud or deceit, which is met by another's contrary allegations that are made in good faith, without fraud or deceit. *In re Ross*, 63 B.R. 951, 960 (Bankr. S.D.N.Y.1986); *Bankruptcy Service*, Lawyer's Edition, § 3A:22 at 27 (1989). A bona fide dispute is also defined as an "honest conflict" or a "good-faith controversy." *Bankruptcy Service*, at 27. To determine whether a debtor's dispute as to liability is "bona fide," the Court must first determine if there is "an objective basis for either a factual or a legal dispute as to the validity of the debt." *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir.1991) *cert. denied, Rimell v. Mark Twain Bank*, —— U.S. ——, 112 S.Ct. 2275, 119 L.Ed.2d 202, (1992). Further, a credi-

tor will have standing to commence an involuntary case, even though a portion of the creditor's claim is the subject of a bona fide dispute, where the undisputed portion of the claim is not contingent as to liability. *In re Broadview Lumber Co.*, 137 B.R. 775, 776 (Bankr.W.D.Mo.1992); *In re F.R.P. Industries, Inc.*, 73 B.R. 309, 312 (Bankr.N.D.Fla.1987); *In re Onyx Telecommunications, Ltd.*, 60 B.R. 492, 498 (Bankr.S.D.N.Y.1985).

■ As to Johnson, any claim he may have against Willow Lake is subject to a bona fide dispute. Defendant states that the letter of credit was required by the Mortgagee as a condition of the loan, and that the $125,000 was Johnson's guarantee that Willow Lake would break even before he could personally benefit from the purchase. Pl.Exh. # 8. Further, the partnership agreement forbids any loan to Willow Lake without the consent of Boston. Def. Exh. # 1 at Art. VI § 6.1(B)(i). There is no evidence that such consent was obtained.

I find that there is a genuine issue of material fact as to whether the debt service escrow agreement required the posting of the letter of credit as a form of collateral for the loan. Therefore, the entire $125,-000 is subject to a bona fide dispute. I further find that there is a genuine issue of material fact as to whether Boston authorized the $35,000 loan to defendant and whether such authorization was required, making that loan subject to a bona fide dispute as well. Therefore, Johnson does not have standing to participate in this involuntary bankruptcy petition.

■ The claims of Maxus are also subject to bona fide dispute. Maxus claims a termination fee in the sum of $144,057.60, unreimbursed payroll expenses in the sum of $91,183, and accrued management fees in the sum of $67,957 as of April 30, 1993. *See* Pl.Exh. # 's 4, 5, and 7. Johnson testified that when Maxus was replaced as the general partner and managing agent of defendant on April 2, 1993, the management agreement provided for a termination fee based upon eighty percent of the last month's fee ($2,000.82) for ninety months (the remaining life of the current management agreement), which comes to $144,-057.60.

Defendant argues that the new management agreement was executed and entered into without the written consent of the Mortgagee, as required by the Assignment of Management Agreement,[2] and that the new agreement is thus invalid. Further, defendant claims that the termination fee for the period of April 28, 1993, until October 31, 1993, which is all that would be owed under the original management agreement, has been paid. I find, that there is a bona fide dispute as to debtor's liability for the termination fee.

With respect to unreimbursed payroll expenses, Johnson testified that Willow Lake had generated too little cash flow to meet those obligations each month, and so Maxus advanced the necessary funds. Johnson further testified that Willow Lake has always shown a loss and, therefore, management fees have accrued.

Brune testified that the general partners of defendant were required to advance monies to cover any shortfall in income needed to pay both payroll and management fees, and that he and Pohrer did make cash advances to Maxus to cover such shortfall. Those advances were made to cover shortfalls on not only Willow Lake, but also on other projects. As a result of the breakup of the relationship between these people, it is now necessary to sort out how much money Maxus spent on each project, where that money came from, and how much is owed to whom. Accordingly, Willow Lake filed a Petition For Accounting and Injunctive Relief or, In the Alternative, Appointment of Receiver in the Circuit Court of Platte County, Missouri on April 27, 1993.

---

**2.** The Assignment of Management contract provides:

Assignor agrees that it shall not cancel, terminate or modify the Management Agreement except with the prior written consent of Noteholder. Assignor further agrees not to exe-cute any additional Management Agreement without obtaining the prior written consent of Noteholder to such additional Management Agreement.

Def.Exh. # 14 at ¶ 5.

*See* Def.Exh. # 16. In this petition Willow Lake contends that Maxus has collected rents and proceeds from the tenants of Willow Lake sufficient to pay both the mortgage and operating expenses due on the property. Since those expenses have not been paid the defendant has asked for an accounting from Maxus as to Willow Lake. As a result of this action pending in Platte County, Missouri, and the testimony of Brune, I find there is a bona fide dispute as to Willow Lake's liability to Maxus.

Maxus contends that there is no dispute that the April 1993, management fees and unpaid payroll expenses are due, and that such amount is in excess of $5,000. However, the Platte County litigation was intended to arrive at a final determination as to all amounts owed. The Platte County litigation, filed April 27, 1993, will determine if Maxus is entitled to any fees, including the month of April. Therefore, all indebtedness which may be due Maxus is contingent as to liability and subject to a bona fide dispute.

On May 4, 1993, the aggregate of the claims held by Summit and Beneficial was $305.33. Neither such claim was contingent or subject to bona fide dispute. However, section 303(b)(1) and (2) requires the total of the claims held by petitioning creditors to be at least $5,000. Therefore, this petition must be dismissed.

■ Defendants raised as an affirmative defense that petitioners filed this involuntary bankruptcy in bad faith and that defendants are entitled to reimbursement for their costs, reasonable attorney's fees, and punitive damages pursuant to section 303(i). Section 303(i) provides that:

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

[ (C) any damages proximately caused by the taking possession of the debtor's property by a trustee appointed under subsection (g) of this section or section 1104 of this title; or]

(2) against any petitioner that filed the petition in bad faith, for—

(A) any damages proximately caused by such filing; or

(B) punitive damages.

11 U.S.C. § 303(i). In the Eighth Circuit it is within the discretion of the Court to award costs and reasonable attorney's fees. *Banker's Trust Company BT Serv. Co. v. Nordbrock (In re Nordbrock),* 772 F.2d 397, 400 (8th Cir.1985); *In re Anderson,* 95 B.R. 703, 704 (Bankr.W.D.Mo.1989). Pursuant to § 303(i)(1), I find that the defendant, Willow Lake, should be awarded attorney's fees in the amount of $14,857.91. Given that Mr. Johnson caused this case to be filed, and that Brune and Pohrer own some interest in Maxus, those fees will be awarded against Johnson only. Willow Lake also seeks reimbursement for the value of the time expended by Boston's employees on the case, as well as their travel expenses of $2,500. No documentation was provided as to the expenses. And, even if I were inclined to allow compensation for the time spent by Boston's salaried employees, no basis has been provided for a breakdown of the cost of that time to Boston. Therefore, Willow Lake's request for costs other than attorney's fees will not be allowed.

■ The next issue relates to damages under § 303(i)(2). That section allows damages to a nondebtor defendant, such as Brune, Pohrer and TSR, and punitive damages to any defendant, if bad faith is shown. In determining bad faith, courts have looked to whether the creditor's actions were an improper use of the Bankruptcy Code as a substitute for customary collection procedures. *See, In re Wavelength, Inc.,* 61 B.R. 614, 622 (B.A.P. 9th Cir.1986); *In re Laclede Cab Co.,* 76 B.R. 687, 693 (Bankr.E.D.Mo.1987).

The Court of Appeals for the Eighth Circuit has stated that the use of an involuntary petition for a non-bankruptcy purpose is evidence of bad faith. *Basin Elec.*

*Power Coop. v. Midwest Processing Co.,* 769 F.2d 483, 487 (8th Cir.1985).

At the time the case was filed, there was pending in state court an action which would, if carried to conclusion, resolve the question of how much Willow Lake owes Maxus. And, Willow Lake has posted a bond, in the amount demanded by Maxus, to secure payment of any judgment which might be entered. Therefore, Johnson did not need this bankruptcy case to collect monies due Maxus. In fact, Johnson used this bankruptcy as a weapon in his larger war with Brune and Pohrer. In so doing, be recruited Summit and Beneficial, with actual knowledge that Willow Lake had funds with which to pay their claims, and that those funds were only frozen because he himself had refused to allow BF access to the property, books and records of defendant. Once he consented to the Platte County injunction the funds were released and checks to both creditors were reissued. In persuading those creditors to join this battle, he exposed them to the potential of both actual and punitive damages. There is no evidence that either Summit or Beneficial was ever advised of such risk; in fact, there is no evidence that they ever discussed the petition or its ramifications with counsel, who was selected by Mr. Johnson. Further, in filing this case Johnson showed no regard for the harm to be caused to Willow Lake or its owner, Boston.

I find that Mr. Johnson acted in bad faith. Therefore, defendants Brune, Pohrer and TSR are entitled to recover from Johnson the damages proximately caused by such filing, which consist of attorney's fees in the amount of $4,920.

Since bad faith has been found, I also must consider whether punitive damages should be awarded. A finding of bad faith permits, but does not mandate, a punitive damage award. 11 U.S.C. § 303(i)(2). To award punitive damages, a court must find either that a wrongful act was done without just cause or excuse, or that such an award is needed to punish a defendant for outrageous conduct. *In re Laclede Cab Co.,* 76 B.R. at 694, and cases cited

therein. While I have found that Johnson initiated this case for an improper purpose, his conduct does not rise to the higher (or perhaps, fall to the lower) level needed to award punitive damages.