**In re Robert R. KNOTH, Debtor.**

**Bankruptcy No. 93–75478.**

United States Bankruptcy Court,
D. South Carolina.

April 1, 1994.

Mark W. McKnight, LeRoy P. Hutchinson, Charleston, SC, for debtor.

William F. Halligan, Robinson, McFadden & Moore, Columbia, SC, for Ford Motor Credit Co. and Ford New Holland, Inc.

Andrew J. White, Jr., Haynesworth, Marion, McKay & Guerard, Greenville, SC, for Kubota Tractor Corp.

George B. Cauthen, Nelson, Mullins, Riley & Scarborough, Columbia, SC, for Nations-Bank of SC.

Lillia Ann Gray, Cooper, Coffas & Megna, Columbia, SC, for Agricredit Acceptance Corp.

## ORDER GRANTING INVOLUNTARY PETITION

WM. THURMOND BISHOP, Bankruptcy Judge.

Before the court is the Involuntary Petition filed November 4, 1993, by Ford Motor Credit Company (hereafter called "FMCC"), Ford New Holland, Inc. (hereafter called "FNH"), and Kubota Tractor Corporation (hereafter called "Kubota"), seeking an order for relief under Chapter 7 of the Bankruptcy Code against Robert R. Knoth (hereafter called "Debtor"). On November 24, 1993, Debtor filed an Answer to the Involuntary Petition, a demand for a jury trial, and a Motion for Withdrawal of the Reference to the Bankruptcy Court. The United States District Court for the District of South Carolina denied the Debtor's Motion for Withdrawal of the Reference and Demand for a Jury Trial by Order of February 23, 1994. On December 16, 1993, NationsBank of South Carolina, N.A. (hereafter called "NationsBank") and on January 13, 1994, Agricredit Acceptance Corporation (hereafter called "Agricredit") moved to join the Involuntary Petition as additional petitioning creditors under 11 U.S.C. § 303(c). Without objection, the Court granted the motions of Nations-Bank and Agricredit by Orders of February 4, 1994.

Debtor asserts that the claims of FMCC, FNH, and Kubota are subject to bona fide dispute, and that the claim of Agricredit is fully secured, so that there are not three qualified petitioning creditors. Debtor also asserts that all of the petitioning creditors are acting in bad faith, which disqualifies them from being petitioning creditors, and asserts a counterclaim for damages, attorney's fees, and costs for a bad-faith filing under 11 U.S.C. § 303(i). Debtor also asserts that he generally is paying his debts as they become due except for those debts which are in bona fide dispute, under 11 U.S.C. § 303(h)(1). The petitioning creditors have the burden of proving by a preponderance of the evidence that the statutory requirements of 11 U.S.C. § 303 have been met. *Atlas Machine & Iron Works v. Bethlehem Steel,* 986 F.2d 709, 716 (4th Cir.1993).

## I. *Facts.*

The Debtor is a resident of Charleston, South Carolina, who owns substantial real property. In September 1989, the Debtor and Howard Lee Ray, Jr. formed Plantation Ford Tractor, Inc. (hereafter called "Plantation"), each owning one-half of the stock of the corporation. Later in September 1989, Plantation purchased certain assets and became a FNH dealer, with FMCC providing inventory financing. In April 1990, Plantation also became a dealer for Kubota. Agricredit provided retail financing with recourse against Plantation. The Debtor personally guaranteed the obligations of Plantation to FMCC, FNH, Kubota, and Agricredit. NationsBank made certain loans to Plantation, guaranteed by the Debtor, and certain loans directly to the Debtor.

The parties have stipulated to the following facts:

(1) the debt due NationsBank pursuant to a $600,000.00 Note dated July 30, 1990, by the Debtor is not contingent nor is it subject to a bona fide dispute; further that this is a joint debt of the Debtor and Howard Lee Ray, Jr., and the debt is secured by a first mortgage on real estate owned by the Debtor and Mr. Ray;

(2) the debt due Agricredit by the Debtor is not contingent nor is it subject to a bona fide dispute;

(3) the total indebtedness due NationsBank by the Debtor exceeds at least $5,000.00 in unsecured debt;

(4) the Debtor's personal aggregate debts exceed $1,500,000.00;

(5) the Debtor's business entities are not primarily nonprofit corporations;

(6) real estate taxes are delinquent on certain properties owned by the Debtor;

(7) within the last 12 months delinquent tax sales have been conducted with respect to certain properties, but the statutory redemption period has not expired, and, in some cases, the property has been redeemed;

(8) the Debtor gave a Confession of Judgment to Mitsui Machinery Distribution on April 20, 1993, in the amount of $85,000.00 in a case docketed as 91–CP–10–2998;

(9) the Resolution Trust Corporation, as conservator for Citadel Federal Savings and Loan Association, is a judgment creditor as to the Debtor, in the amount of $133,427.24, as shown by a judgment filed on the 24th day of November 1993 in the Office of the Clerk of Court of Common Pleas for Charleston County, which debt was past due as of November 4, 1993;

(10) the Resolution Trust Corporation, as conservator for Citadel Federal Savings and Loan Association, is a judgment creditor as to the Debtor, in the amount of $468,534.05, as shown by judgment filed on the 24th day of November 1993 in the Office of the Clerk of Court of Common Pleas for Charleston County, and that judgment has been satisfied;

(11) Agricredit Acceptance Corporation is a judgment creditor as to the Debtor and H. Lee Ray, Jr. as shown by a judgment filed in the amount of $318,083.46 on the 22nd day of September 1993 with the Clerk of Court of Common Pleas for Charleston County;

(12) on or about January of 1994, NationsBank instituted foreclosure proceedings on property which was conveyed by the Debtor to the Knoth Family Limited Partnership in December 1992 and located at 28 Queen Street, and a Receiver has been appointed;

(13) on or about January of 1994, NationsBank instituted foreclosure proceedings upon property which was conveyed by the Debtor to the Knoth Family Limited Partnership in December 1992 at 5 Longitude Lane and 7 Longitude Lane, and a Receiver has been appointed;

(14) the Debtor owns fifty percent (50%) of Plantation Ford, which is presently in Chapter 7 after an unsuccessful Chapter 11;

(15) on or about December 1992 the "Knoth Family Limited Partnership" was created with the Knoth Corporation as the only general partner and the Debtor, his wife and children as the only limited partners; this was subsequently changed to "Centaur Limited Partnership" in 1993;

(16) the Debtor directly owns a 70.14% limited partnership interest in Centaur Limited Partnership;

(17) the Debtor is the President of and a shareholder of the Knoth Corporation;

(18) substantial assets have been transferred from the Debtor, to the "Knoth Family Limited Partnership" and/or "Centaur Limited Partnership" as shown on Exhibit "A" to the stipulation, described briefly as follows:

Charleston County:

Residual Ravenel Tract (Rhett's Crossing 270± acres)

301–303 Charleston Blvd., Isle of Palms

219 Charleston Blvd., Isle of Palms

5 Longitude Lane, Charleston

7 Longitude Lane, Charleston

28 Queen Street, Charleston

6 Longitude Lane, Charleston

1 Rutledge Ave., A & B, Charleston

Lt. A, O Rutledge Ave., Charleston

Lt. B., 171 Tradd St., Charleston

Ravenel Town Tract a/k/a Butler Tract (Town Hall Tract 75 ± acres-security for Quinby Foods)

Berkeley County:

Quinby Plantation—633.12 acre

Quinby Plantation—983.28 acre

Quinby Plantation—31.50 acre

Quinby Plantation—102.79 acre

Quinby Plantation—172.01 acre

Bates Place Contents

Georgetown County:

Moreland Plantation

(19) in 1992 and 1993 Debtor listed on certain of his financial statements an ownership interest in B.C. Land Company and one of the properties of B.C. Land Company was Rhoden Island, valued at $2,500,000.00 based upon 250 acres of highland at $10,000.00 per acre; Debtor's profit and loss interest in B.C. Land Company was transferred to Centaur Limited Partnership; and

(20) in December 1993 B.C. Land Company sold Rhoden Island for $650,000.00 with Centaur Limited Partnership and other Knoth entities receiving $406,908.00, and disbursing that amount as set forth in Exhibit "B" to the stipulation, as follows:

| | |
|---|---|
| Bank of Charleston 37 Meeting Mortgage | $193,182.50 |
| First Federal Savings & loan Real Estate Taxes | $ 33,048.78 |
| Edisto Farm Credit Quinby Mortgage | $ 86,628.11 |
| Edisto Farm Credit | $ 33,000.00 |
| SouthTrust Bank 37 Meeting Mortgage | $ 21,197.70 |
| Liberty Bank Town Hall Mortgage | $ 39,000.00 |
| Knoth Corporation | $ 850.91 |

The court also finds that only a portion of the loan of $270,000.00 from Charleston Capital Corporation to Plantation in January 1992 went to Plantation. $100,000.00 was disbursed at closing to First Federal of Charleston to repay the Debtor's personal loans, and the Debtor received $110,000.00 from Plantation on the day of the closing to partially repay his loans to Plantation.

Concerning the tax sales described in stipulation number 7 above, nine tracts of land in Berkeley County, including Quinby Plantation, have been sold for nonpayment of 1992 real property taxes, and five properties in Charleston County similarly have been sold for delinquent taxes.

Concerning the sale of Rhoden Island described in stipulation numbers 19 and 20 above, the Court also finds that Rhoden Island was owned as of 1987 by B.C. Land Company in which the Debtor held personally a 58% interest and an additional 12% interest as trustee for his sons. However, the Debtor represented on his financial statement of August 31, 1990, that he owned all of Rhoden Island, without mentioning the interest of either B.C. Land Company or his sons. On his financial statement of March 31, 1992, Rhoden Island was disclosed as being owned by B.C. Land Company in which he held a 70% interest, which still did not reflect his trusteeship.

Concerning the creation of and transfers to the Family Partnership in December of 1992, the Court finds that the Debtor gave partnership units with an asserted value of $1.2

million to his wife and children in December of 1992.

## II. *Evidence of the petitioning creditors' good or bad faith is irrelevant in deciding whether the involuntary petition should be granted.*

The Debtor asserts that if the petitioners filed the petition in bad faith, they do not qualify under 11 U.S.C. § 303(b)(1). This argument was raised at the hearing, although it is not raised in the Debtor's Answer; the Debtor's Answer asserts only a counterclaim under 11 U.S.C. § 303(i)(2) for a bad faith filing.

■ 11 U.S.C. § 303(i) provides as follows:

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor ..., the court may grant judgment— ... (2) against any petitioner that filed the petition in bad faith....

Further, Bankruptcy Rule 1011(d) provides "[a] claim against a petitioning creditor may not be asserted in the answer except for the purpose of defeating the petition." Thus, under the terms of the statute, a prerequisite for a claim of bad faith is that the court must have dismissed the petition. Since the court grants the petition, the prerequisite has not been satisfied, and the motivation of the petitioning creditors is irrelevant on the question of whether the involuntary petition should be granted. *See In re Sweet Transfer and Storage, Inc.,* 896 F.2d 1189, 1191 (9th Cir.1990).

## III. *Three petitioning creditors satisfy 11 U.S.C. § 303(b)(1).*

The parties agreed at the beginning of the hearing on March 22, 1994, that the court should determine whether or not there were three petitioning creditors whose claims qualified under 11 U.S.C. § 303(b)(1) before considering other issues. Since the court has concluded that the claims of NationsBank, Agricredit, and Kubota satisfy those requirements, the parties did not offer evidence and the court makes no findings of facts or conclusions of law concerning the claims of FMCC and FNH.

1. *NationsBank.* NationsBank is properly a petitioning creditor as stipulated by the parties.

2. *Agricredit.* Agricredit's claim is founded on its judgment of $318,083.46. The Debtor asserted that Agricredit was fully secured because the judgment attached to the Debtor's personally owned real property, principally his residence at 37 Meeting Street and the Mathews Tract/Strawberry Farm. The Debtor also asserts that Agricredit, as a secured creditor, could not join in the petition under 11 U.S.C. § 303(c) which states that:

... a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section. 11 U.S.C. § 303(c).

■ The court holds that Agricredit is properly a petitioning creditor on three grounds, each of which is sufficient in itself.

Secured creditors may act as petitioning creditors if they intentionally waive their security, omit to mention it in the petition or if the other petitioning creditors' claims aggregate at least $5,000.00 over the value of any lien as provided for in Section 303(b)(1). 2 *Collier on Bankruptcy* ¶ 303.-08[5] at 303–30 (15th ed. 1993).

First, the Debtor did not object to the motion of Agricredit to join in the petition, which was the time to raise the issue of Agricredit's secured status. After the court granted the motion, Agricredit joined in the petition "with the same effect as if [it] were a petitioning creditor under [§ 303](b)." *See* Bankruptcy Rule 7009(a).

Second, § 303(b) "requires only that a petitioner be an entity which holds a non-contingent, undisputed claim against the Debtor ... [which is] broad enough to include a fully secured holder of a non-contingent, undisputed claim." *Paradise Hotel Corp. v. Bank of Nova Scotia,* 842 F.2d 47, 49 (3rd Cir.1988). Since NationsBank by stipulation satisfies the requirement that "the other petitioning creditors' claims aggregate at least $5,000.00" of unsecured claims, Agricredit

could be fully secured and the petitioning creditors as a group would satisfy the $5,000.00 unsecured claim requirement.

Third, Agricredit expressly waived its security at the hearings on March 22, 1994, and on March 30, 1994. Thus, for the purposes of this Chapter 7 case, Agricredit is an unsecured creditor. 2 *Collier on Bankruptcy* ¶ 303.08[5]; *American Gypsum Co.,* 31 B.R. 187 (Bankr.D.N.Mex.1983).

■ 3. *Kubota.* The Debtor asserts that Kubota's claim is the subject of a bona fide dispute consisting of the Debtor's defenses and counterclaims in the pre-petition action instituted by Kubota against him.

*In re Sea Island Resorts,* 82 B.R. 404 (Bankr.D.S.C.1987) and *In re Galaxy Boat Manufacturing Co., Inc.,* 72 B.R. 200 (Bankr. D.S.C.1986) govern the issue of whether creditors' claims are in bona fide dispute. The court followed *Matter of Covey,* 650 F.2d 877 (7th Cir.1981) in applying a three part test that a debt should be excluded if:

(1) the dispute is whether any claim exists, not merely regarding the amount of the claim;

(2) the dispute can be examined without substantial litigation of legal or factual questions; and

(3) the interest of the debtor in defeating an order of involuntary bankruptcy outweigh [the] creditors interest in achieving a somewhat more rapid determination of the involuntary bankruptcy question.

*Sea Island Resorts,* 82 B.R. at 406; *Galaxy Boat,* 72 B.R. at 202; *Covey,* 650 F.2d at 883–84.

A debtor's counterclaims against a creditor do not create a bona fide dispute about the creditor's claims.

As a general rule the debtor's assertion of counterclaims, even if of substance, does not render the petitioner's claim the subject of a bona fide dispute. Counterclaims serve, if established, to work a diminution or set off of the claim of the petitioning creditors [under the analysis of either 11 U.S.C. §§ 303(b)(1) or (h)(1) ]. *In re Drexler,* 56 B.R. 960, 969 (Bankr.S.D.N.Y. 1986).

"Counterclaims may work a diminution of the claim, but they do not dispute the merits of the claim itself." *In re Atwood,* 124 B.R. 402, 409 (S.D.Ga.1991).

The Debtor admits the validity of the Kubota guaranty, but did not have any knowledge of the amount of the debt. There is no evidence to contradict Kubota's proof of its debt in excess of $374,000.00, of which $267,-000.00 was for sales out-of-trust. The Debtor raised the defenses that Kubota violated certain franchise laws in connection with the Plantation dealership agreement, did not terminate the Plantation dealership in accordance with the dealership contract, and committed unfair trade practices regarding Plantation. All of these counterclaims belong to the Chapter 7 estate of Plantation and not to the Debtor.

■ It is a general rule of law, that a guarantor, when sued on a contract of guaranty, may not set off against the guaranty liability a claim arising out of a separate and distinct transaction. Likewise, in an action brought by the creditor solely against the guarantor, the guarantor will not be permitted to plead a claim for setoff which belongs solely to the principal debtor. 38 C.J.S. *Guaranty,* § 89; 38 Am Jur.2d *Guaranty,* § 52 at 1056. Matters of setoff or counterclaim do not concern the validity of the underlying contract between the principal debtor and the creditor, and, further, it is only the principal debtor who possesses the counterclaim and who has the right to elect whether the counterclaim should be asserted. If the guarantor were allowed to assert the counterclaim which belongs to a principal debtor, the rights of the principal debtor could be adversely affected in the action between the guarantor and the creditor. This rule has been applied often. *E.g., United States v. Perez,* 528 F.Supp. 206 (D.P.R. 1981); *Green v. Mill Factors Corp.,* 125 Ga. App. 603, 188 S.E.2d 519 (1972); *Stifel Estate Co. v. Cella,* 220 Mo.App. 657, 291 S.W. 515; *Ralston Purina Co. v. Siegel's Poultry, Inc.,* 24 A.D.2d 926, 264 N.Y.S.2d 601 (1965);

Thus, the creditors have met the threshold test of three holders, NationsBank, Agricredit, and Kubota, of claims against the Debtor whose claims are not contingent as to liability

or the subject of a bona fide dispute, whose claims aggregate at least $5,000.00 of unsecured claims.

### IV. *The Debtor generally is not paying his debts as they become due.*

The petitioners must prove that "the debtor is generally not paying such debtor's debts as they become due unless such debts are the subject of a bona fide dispute...." 11 U.S.C. § 303(h)(1).

■■■ The "generally not paying" test is determined as of the date of the filing of the involuntary petition. *In re Galaxy Boat Manufacturing, Inc.,* 72 B.R. 200, 203 (Bankr.D.S.C.1986). No demand is necessary to render a debt past due. *In re All Media Properties, Inc.,* 5 B.R. 126, 2 C.B.C.2d 449, 471 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). A "mechanical test" with five factors is used as a starting point:

[1] the timeliness of payments on past due obligations;

[2] the amount of debts long overdue;

[3] the length of time during which the debtor has been unable to meet large debts;

[4] any reduction in the debtor's assets; and

[5] the debtor's deficit situation.

*Galaxy Boat,* 72 B.R. at 203, *citing In re Dakota Lay'd Eggs,* 57 B.R. 648, 657 (Bankr. D.N.D.1986). *See also In re Gill Enterprises, Inc.,* 15 B.R. 328, 332 (Bankr.D.N.J.1981); 2 *Collier,* ¶ 303.12 at 303–64.

"Although offering guidance, the mechanical test must be employed with regard to any unique circumstances attendant to a particular proceeding." *Galaxy Boat,* 72 B.R. at 203; *Dakota Lay'd Eggs,* 57 B.R. at 657, *citing In re Midwest Processing Co.,* 41 B.R. 90 (Bankr.N.D.1984) and *All Media Properties.* "[T]he court must inquire whether the debtor's financial affairs are being handled in a manner consistent with good faith and in the ordinary course of business." *In re CLE Corporation,* 59 B.R. 579, 588 (Bankr. N.D.Ga.1986); 2 *Collier,* ¶ 303.12 at 303–64.

■■■ The evidence and stipulations establish the following facts concerning the first three factors, timeliness of payments, amount of debts long overdue, and the length of time during which the debt has been unable to meet large debts.

(1) NationsBank has received sporadic payments since early 1992 on approximately $500,000.00 of unsecured debt and an additional $1.2 million in secured or partially secured debts.

(2) Kubota has not received any payments since June 1992 on its unsecured debt of $374,000.00, of which $267,000.00 is for sales out-of-trust.

(3) Agricredit has not received any payments on its judgment amount of $318,083.46, which it obtained on September 22, 1993.

(4) On November 24, 1993, on debts which were past due on November 4, 1993, Citadel Federal obtained a judgment of foreclosure and sale in the amount of $468,534.05 and waived its deficiency, but also obtained a separate judgment for $133,427.24 on unsecured loans.

(5) Mitsui obtained a judgment of $85,-000.00 on April 20, 1993, which is unpaid.

(6) On October 4, 1993, nine tracts of land in Berkeley County were sold for nonpayment 1992 real property taxes, including the Debtor's single most valuable asset, Quinby Plantation. Five properties in Charleston County also have been sold for nonpayment of real property taxes.

(7) Charleston Capital Corporation loaned Plantation Ford $270,000.00 in January 1992, and the testimony established that it received four interest payments, and then Plantation Ford and Knoth defaulted on the loan in June 1992.

(8) The Hood Law Firm is owed $2,372.32, upon which the last payment was received April 1993.

Payments of a debtor's obligations by a third party are not treated as payment by the debtor himself. *In re H.I.J.R. Properties Denver,* 115 B.R. 275, 277–78 (D.Colo. 1990); *In re Midwest Processing Co.,* 41 B.R. 90, 101 (Bankr.D.N.D.1984); *In re B.D. Int'l Discount Corp.,* 15 B.R. 755, 760 (Bankr.

S.D.N.Y.1981), aff'd 24 B.R. 876 (S.D.N.Y. 1982), aff'd 701 F.2d 1071 (2d Cir.1983). Virtually all of the creditors who testified on behalf of the Debtor are subject to this exclusion:

(1) LEB Excavating has received payments of $40,000.00 from insurance and bonding companies, but none from the Debtor, leaving a balance of $10,000.00, based on a March 1992 agreement which was to have been paid by September 1992;

(2) all of the payments being made to First Liberty Bank of Savannah were made by Quinby Foods, Inc., a corporation owned by the Debtor's wife;

(3) SouthTrust and First Union Bank are receiving payments 45–60 days late, but according to testimony all payments were being made by Carolina Carriage Company, Inc., a corporation now owned by Centaur Family Partnership;

(4) testimony concerning SCN established that the Debtor was past due on three installments as of November 4, 1993, and that the principal reduction and interest payments made thereafter were made by the South Carolina Public Service Authority for its easement and were not received from the Debtor.

The testimony on behalf of the Edisto Credit Bank established that it granted forbearance to the Debtor for the payment due in October 1993 to be paid from the sale of Rhoden Island in mid-December 1993. Although the court in *All Media Properties* found that an extension agreement in that case was of minimal importance, "making arrangements to extend payments is evidence of failure to pay debts as they become due." *All Media Properties,* 5 B.R. at 145, 2 C.B.C.2d at 470–71.

The fourth factor is whether there has been any reduction in the Debtor's assets. This is established conclusively by the Debtor's financial statements. His financial statement of March 31, 1992, which was three months before the filing of the Plantation Ford Chapter 11 case, showed total assets of $24.7 million and total liabilities of $6.4 million. However, his financial statement of December 31, 1993, which the Debtor testified was accurate as of the filing of the petition on November 4, 1993, shows total assets of $13.5 million and liabilities of $6.4 million. Thus, the Debtor's assets have decreased by more than $10 million from March 31, 1992, until November 4, 1993. Furthermore, the Debtor has been advised by his lawyer to continue making gifts to family members, and the tax sales threaten the loss of vital assets.

The fifth factor is the Debtor's deficit situation. It appears from the evidence that the Family Partnership and the Debtor own assets with substantial value which do not generate enough cash to pay his debts. The factors "of the number and amount of debts and their relationship to aggregate indebtedness and monthly accruals should be viewed in the context of the debtor's liquidity." *In re Reed,* 11 B.R. 755, 4 C.B.C.2d 934, 940 (Bankr.S.D.W.Va.1981). The sale of Rhoden Island in December 1993 was compelled by the Debtor's need to sell lightly encumbered property to generate cash to pay current and past due debts secured by other property and is a compelling admission that the Debtor was otherwise incapable of paying his debts. The financial statements for August 31, 1990, and March 31, 1992, show that the Debtor represented to creditors that Rhoden Island had a value of $2.5 million, although the sales price in December 1993 was $650,-000.00. The sales proceeds were used to bring current the obligations of the Debtor, the Family Partnership, Quinby Foods, Inc., and Carolina Carriage Company, Inc. on various secured loans, which otherwise would have gone into default.

The circumstances of this case include an inquiry into whether the Debtor's financial affairs are being handled in good faith, with fairness to all of his creditors, and in the ordinary course of business. The transfers to the Family Partnership in the midst of Plantation's Chapter 11 case, and the use of the proceeds of the Rhoden Island sale show that his financial management has not been characterized by good faith, and is not in the ordinary course of business.

The transfer to the Family Partnership occurred in the middle of the Plantation Ford

Chapter 11 case, when the Debtor was assuring the court and the creditors that he could provide post-petition financing. The Chapter 11 case failed principally because there was insufficient post-petition financing and the Debtor was unwilling or unable properly to capitalize the business.

Although there may be legitimate estate planning reasons for the transfer to the Family Partnership, if the petition is dismissed, the transfer to the Family Partnership will become a hard shield against creditors trying to collect their debts. Instead of judgment liens on real property, creditors can recover unsecured notes payable in annual installments over 15 years, with no restrictions on the partnership's assets. The value of the Debtor's property has declined by $10 million since the transfer. The gross overstatement of the value of Rhoden Island and the increase in the Debtor's valuation of his house by $820,000.00 from September 30, 1993, to December 31, 1993, raise profound uncertainty about the values he has placed on other property. In addition to the gift of $1.2 million in December 1992 to his wife and children, the Family Partnership also is the means for additional gifts to the Debtor's family, without regard for his creditors. Moreover, the sales proceeds of Rhoden Island were used to pay the debts of many of the Debtor's related entities, with nothing to his unsecured creditors.

## V. *Conclusion.*

The petitioning creditors have met their burden of proving the statutory requirements of 11 U.S.C. § 303.

NOW, THEREFORE, IT IS

ORDERED that the relief sought by the Involuntary Petition under Chapter 7 of the Bankruptcy Code, filed November 4, 1993, against Robert R. Knoth, hereby is granted;

AND IT IS SO ORDERED.