**In re The FOOD GALLERY AT VALLEYBROOK, Debtor.**

**Bankruptcy No. 98–21752–MBM.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 22, 1998.

Robert A. King, George M. Cheever, Philadelphia, PA, for Elmhurst Corporation.

Regina Stango Kelbon, Michael L. Krancer, Philadelphia, PA, for Traders Crossing, Inc.

## MEMORANDUM OPINION

M. BRUCE McCULLOUGH, Bankruptcy Judge.

This Court ruled on March 23, 1998, that a voluntary petition filed on behalf of the Food Gallery at Valleybrook, the above-captioned debtor, by Elmhurst Corporation (hereafter "Elmhurst"), one of two general partners in said debtor, would be treated prospectively as a de facto involuntary petition because Elmhurst, although possessing authority to file a voluntary petition on the debtor's behalf, nevertheless also needed the consent of the debtor's other general partner, Traders Crossing, Inc. (hereafter "Traders"), which consent was lacking. Because the petition filed by Elmhurst is now treated as an involuntary petition, Traders, the nonconsenting partner, is afforded the opportunity, and has elected, to contest the involuntary petition pursuant to 11 U.S.C. § 303(d) and Fed. R.Bankr.P. 1011(a). As a consequence, the Court held a trial on May 4, 1998 and July 6–7, 1998, to determine whether it should grant an order for relief against the debtor. Pursuant to 11 U.S.C. § 303(h)(1), the trial was confined to the sole issue of whether the debtor is generally not paying its undisputed debts as such debts become due. For reasons to be set forth below, the Court now (a) finds that the debtor is **GENERALLY NOT PAYING ITS DEBTS** as they become due, and (b) **ORDERS RELIEF AGAINST THE DEBTOR.**

### STATEMENT OF FACTS

The debtor is a Pennsylvania limited partnership which was created in 1988 to own, develop, operate, and manage a grocery store in McMurray, Pennsylvania.[1] Elmhurst and Traders are the two general partners of the debtor and each holds a total ownership interest in the debtor of 47.5%.[2] Elmhurst and

1. The facts set forth herein are obtained from exhibits presented at trial, trial testimony, motions and briefs of both Elmhurst and Traders, and opinions and orders of Judge R. Stanton Wettick, Jr., Pennsylvania Court of Common Pleas for Allegheny County, regarding litigation between the parties in that court. Many of the facts are not subject to dispute between the parties and, consequently, this Court will provide specific citations to sources only in the instances where either disputes may potentially exist or such detail might be useful.

2. Elmhurst and Traders each possess 10% general partnership interests in the debtor. They both also possess 37.5% limited partnership interests in the debtor, although Elmhurst's limited partnership interest is directly held by Elmhurst

Traders both made initial equity contributions to the debtor of $500,000. Additionally, Elmhurst and Traders, by virtue of terms within their partnership agreements,[3] each obligated themselves to fund operating deficits of the debtor through loans to the debtor totalling no more than $60,000 each per year, not to exceed a total at any one time of $600,000. Pursuant to this undertaking, Elmhurst and Traders each loaned the debtor $285,000 between 1990 and 1992 to fund operating deficits in those years totalling $570,000.

Elmhurst also holds a secured claim against the debtor which is valued at $6,247,170 as of May 2, 1998.[4] *See* Exhibit TCI–7, p. 4.[5] Elmhurst's secured claim arose by virtue of its acquisition, on October 30, 1992, from Daiwa Bank, Ltd. (hereafter "Daiwa"), of a $5.7 million secured obligation due to Daiwa from the debtor.[6] Elmhurst obtained the $5.7 million obligation from Daiwa at this time because (a) said obligation, which was incurred in 1989 by the debtor to finance its acquisition of land and equipment for, as well as construction of, its grocery store operation, then became due in its entirety,[7] (b) Elmhurst, which, by virtue of the

partnership agreements between itself and Traders, had an obligation to seek refinancing of said obligation, was unsuccessful at that time in obtaining such refinancing to which Traders was agreeable, and (c) Elmhurst understandably wished to avoid a default on the obligation, since Elmhurst and its thirteen individual general partners personally guaranteed payment on the obligation.

On March 16, 1993, Judge R. Stanton Wettick, Jr., Pennsylvania Court of Common Pleas for Allegheny County, decided that the debtor had defaulted on the $5.7 million obligation notwithstanding its acquisition by Elmhurst because (a) the debtor had failed to satisfy the obligation in accordance with its terms, and (b) Elmhurst's purchase thereof did not cure the default, and the debtor was now obligated to Elmhurst on the obligation, since Elmhurst was entitled to accept an assignment of the obligation and was not required to satisfy it itself. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 5 & 13 (Pa.Com.Pl.1993); *see also Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 2, 5–6 & 17 (Pa.Com.Pl.1997). As a result, and because a sufficient time had

Company, L.P., a Pennsylvania limited partnership in which Elmhurst is the sole general partner. For purposes of this opinion, any further references to "Elmhurst" shall refer to both Elmhurst Company, L.P. and Elmhurst Corporation. The remaining limited partnership interest of 5% is held by a number of individuals, none of whom appear to have any impact on the matters dealt with herein.

3. As Judge Wettick found,
 [t]he rights and responsibilities of Elmhurst and Traders are governed by four partnership agreements: a March 17, 1988 Preliminary Partnership Agreement, a March 17, 1988 Supplemental Agreement, a September 6, 1989 Agreement of Limited Partnership, and a September 6, 1989 Second Supplemental Agreement. The 1989 partnership agreements were negotiated and signed after the parties' agreement was finalized. They are intended to supersede the 1988 partnership documents in part. However, some provisions of the 1988 documents have survived.
 *Elmhurst Co., L.P. v. Meyers. et al.,* No. GD91–00574 at 2 (Pa.Com.Pl.1993). For the sake of simplicity, this Court will refer to the partnership agreements herein in the aggregate unless further detail is necessary.

4. The amount of Elmhurst's claim against the debtor is a continuing source for dispute between

Elmhurst and Traders because the parties disagree as to the appropriate rate at which interest accrues on the debt. *See* Exhibit TCI–7, p. 11 (Note B).

5. Although Elmhurst's secured claim is listed at $6,247,170 in the debtor's balance sheet at Exhibit TCI–7, p. 4, it is listed at $6,247,710 in Note B to the Financial Statements. *See* Exhibit TCI–7, p. 11.

6. Elmhurst obtained the obligation from Daiwa in the following manner:

 On October 30, 1992, Elmhurst obtained a $3 million loan from Mellon Bank which it pledged to PNB. In turn, PNB made a loan to Elmhurst in excess of $6 million. Elmhurst used these proceeds to buy the note and mortgage between Daiwa and Valleybrook.
 *Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 5 (Pa.Com.Pl.1993).

7. The loan actually became due in its entirety, by terms of the debtor's loan agreement with Daiwa, on September 30, 1992. However, Daiwa agreed to extend full repayment until October 30, 1992. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 3 & 5 (Pa.Com.Pl.1993).

484

passed since the default had occurred, Judge Wettick directed that Elmhurst be permitted to exercise its rights under Section 5.3 of the September 6, 1989 Agreement of Limited Partnership. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 13 & Preliminary Injunction (Pa.Com.Pl.1993). Section 5.3 entitles Elmhurst to join Traders in the management and operation of the debtor, with Elmhurst's decisions to prevail in the event of a disagreement between itself and Traders. *See* Exhibit E–3 at 11. Prior to March 16, 1993, Traders, as the "operating partner," had assumed exclusive responsibility for the day-to-day management and operations of the debtor. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 2 (Pa.Com.Pl.1993). Despite Judge Wettick's ruling on March 16, 1993, Elmhurst apparently abstained from making unilateral decisions regarding the day-to-day affairs of the debtor until May 1997. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 1 note 1 (Pa.Com.Pl.1997); Exhibit TCI–25; and *infra* p. 484–85 and note 9.

Judge Wettick held, on February 4, 1997, that the $5.7 million obligation remained in default as of that time because Elmhurst had not yet obtained long-term refinancing suitable to both Elmhurst and Traders, and the debtor had not been able to satisfy the obligation from its operations. *Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 3 & 17 (Pa.Com.Pl.1997). However, Judge Wettick also held at that time that Elmhurst could not foreclose on the obligation even though it possessed the rights of a mortgagee pursuant to its acquisition of the obligation from Daiwa in 1992. *See Id.* at 3 & 17–19. Judge Wettick premised his holding on an interpretation of the partnership agreements between Elmhurst and Traders, concluding ultimately that (a) permitting Elmhurst to foreclose on the obligation merely because the $5.7 million obligation had not

been satisfied in full would constitute a "benefit" to Elmhurst that was not contemplated by the partnership agreements between Elmhurst and Traders, and (b) Elmhurst should not be able to benefit in such a manner because (i) the obligation had not been satisfied due to Elmhurst's own failure to obtain its refinancing, even though such failure was through no fault of Elmhurst's,[8] and (ii) such refinancing was supposedly "within Elmhurst's control." *See Id.* Nevertheless, Judge Wettick reiterated, in his decision of February 4, 1997, that Elmhurst could continue to jointly manage and operate the debtor, with Elmhurst's decisions to prevail in the event of a disagreement between itself and Traders pursuant to Section 5.3 of the September 6, 1989 Agreement of Limited Partnership. *See Id.* at 3 & 17.

Pursuant to its rights under Section 5.3, Elmhurst opted to take exclusive responsibility for the debtor's management and operations in or about May 1997. *See* Exhibit TCI–25 at 1.[9] At that time the debtor was experiencing a severe cash crisis, as evidenced by, *inter alia,* (a) a cash overdraft position of $105,762 as of April 19, 1997, *see* Exhibit E–16, p. 2 (1st line of current liabilities), and $21,219 on May 17, 1997, *see* Exhibit E–17, p. 2 (1st line of current liabilities), and (b) a positive cash position of only $1,572 as of December 28, 1996, especially when compared to a positive cash position of $148,718 just one year earlier. *See* Exhibit E–15, p. 1 (1st line of current assets). In order to address the debtor's cash situation, Elmhurst loaned funds to the debtor on May 16, 1997, as well as on several subsequent occasions leading up to the present time. As of May 2, 1998, Elmhurst has made "excess" loans to the debtor within the past year totalling $1,046,700, exclusive of interest. *See* Exhibit E–27 & Exhibit TCI–7, p. 12 (Note F). Of the $1,046,700 that Elmhurst loaned to the

8. Judge Wettick specifically found that (a) Elmhurst, pursuant to the partnership agreements, was only obligated to use its "best efforts" to obtain suitable refinancing, (b) "Elmhurst had used its best efforts to obtain" said refinancing, and (c) Elmhurst had not breached its obligations to Traders in this regard. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 9 & 14 (Pa.Com.Pl.1993); *see also Elmhurst Co., L.P.*

*v. Meyers, et al.,* No. GD91–00574 at 3 & 5 (Pa.Com.Pl.1997).

9. Although Elmhurst conveyed to Traders its intent to assume responsibility for the daily management and operations of the debtor on April 9, 1997, the parties concur that the transition in responsibility was not effectuated until at least May 1997.

debtor, $60,000 purportedly represents Elmhurst's share of the amount required of each general partner to fund annual operating deficits. *See* Exhibit TCI–7, p. 12 (Note F). Traders, however, has not loaned any funds to the debtor in either 1997 or 1998. *See Id.* The debtor's positive cash balance as of May 2, 1998 equals $786,057. *See* Exhibit TCI–7, p. 3.

Elmhurst, on behalf of the debtor, also appears to have noticeably slowed the pace with which the debtor satisfied its accounts payable, as evidenced by (a) an increase in the debtor's accounts payable from May 18, 1997 to June 14, 1997 (ie., the first month in which Elmhurst assumed responsibility for the day-to-day affairs of the debtor) of $355,-160, *see* Exhibit E–18, p. 9 (Statement of Cash Flows, 1st column), and (b) an increase in accounts payable from May 18, 1997 to May 2, 1998 (ie., approximately the first year in which Elmhurst managed the debtor's daily affairs) of $74,142.[10] By slowing down payment of accounts payable the debtor, of course, generates additional cash with which to operate. Similar analyses by the Court from those sources just cited reveal that the debtor's accounts receivable, inventories, and prepaid assets generated additional cash for the debtor of approximately $75,000 between May 18, 1997 and May 2, 1998.

In the four and one-half years preceding Elmhurst's assumption of responsibility for management of the debtor's day-to-day affairs, or from January 1992 to June 1997, the debtor expended an average of $16,016 on fixed asset acquisitions. *See* Exhibit TCI–3 (sum of amounts on "Fixed Asset Acquisitions" line, or $72,073, divided by 4.5 years). Since May 18, 1997, Elmhurst, on behalf of the debtor, has invested approximately $211,-077 in capital expenditures.[11]

Since May 1997 when Elmhurst assumed responsibility for the day-to-day management of the debtor's operations, the debtor has failed to make any payments of either principal or interest on the $5.7 million obligation which is now owed to Elmhurst. *See* Exhibit E–15, p. 1 ($4,950.000 outstanding balance on debt to Elmhurst at 12/28/96); Exhibit E–18, p. 11 (Note B) ($4,890,000 outstanding balance on same debt at 51/17/97, which is restated to $5,690,645 to reflect disputed accrued interest); Exhibits E–19 to E–21 & TCI–6 to TCI–7 (loan payable to Elmhurst on page 4 of each exhibit reflects an increasing outstanding balance each month, which indicates both a failure to pay down principal and an accrual of interest). This is in direct contravention of Judge Wettick's decision of June 24, 1994, wherein Judge Wettick directed that Elmhurst, pursuant to several provisions in the partnership agreements, was entitled to require the debtor to make monthly payments of both principal and interest to Elmhurst on the $5.7 million obligation, regardless of whether said obligation is ultimately refinanced by Elmhurst. *See Elmhurst Co., L.P. v. Meyers, et al.*, No. GD91–00574 at 10–14 & Order of Court (Pa.Com.Pl. 1994); *see also Elmhurst Co., L.P. v. Meyers, et al.*, No. GD91–00574 at 13 (Pa.Com.Pl.

---

**10.** The debtor's accounts payable decreased by $36,260 from 12/29/96 to 5/18/97 (ie., the last months during which Traders controlled the debtor's daily affairs) as evidenced by an increase of $318,900 from 12/29/96 to 6/14/97, *see* Ex. E–18, p. 9 (St. of Cash Flows, 2nd col.) less an increase of $355,160 from 5/18/97 to 6/14/97. *See* Ex. E–18, p. 9 (St. of Cash Flows, 1st col.). However, the debtor's accounts payable increased by $191,063 during the period from 12/29/96 to 12/27/97, *see* Ex. E–19, p. 10 (St. of Cash Flows, 2nd col.), which means that the debtor's accounts payable increased by $227,323 during the period from 5/18/97 to 12/27/97 (ie., $36,260 + $191,063). Because the debtor's accounts payable decreased by $153,181 from 12/28/97 to 5/2/98, *see* Ex. TCI–7, p. 9 (St. of Cash Flows, 2nd col.), the debtor's accounts payable increased by a net of $74,142 from 5/18/97 to 5/2/98 (ie., $227,323 − $153,181).

**11.** The debtor purchased fixed assets of $4,875 between 12/29/96 and 5/18/97, as evidenced by purchases of $4,589 between 12/29/96 and 6/14/97, *see* Ex. E–18, p. 9 (St. of Cash Flows, 2nd col.), less negative purchases, or proceeds, of $286 between 5/18/97 and 6/14/97. *See* Ex. E–18, p. 9 (St. of Cash Flows, 1st col.). However, the debtor purchased fixed assets of $193,617 from 12/29/96 to 12/27/97, *see* Ex. E–19, p. 10 (St. of Cash Flows, 2nd col.), which means that the debtor purchased fixed assets of $188,742 between 5/18/97 and 12/27/97 (ie., $193,617 − $4,875). Because the debtor purchased an additional net $22,335 in fixed assets between 12/28/97 and 5/12/98, *see* Ex. TCI–7, p. 9 (St. of Cash Flows, 2nd col.), the debtor's fixed assets purchases between 5/18/97 and 5/2/98 totalled $211,077 (ie., $188,742 + $22,335).

1993) (the debtor was not making any principal payments at this time and Judge Wettick held that Elmhurst is "not obligated to allow the Partnership [(ie., the debtor)] to make only interest payments"). Traders acknowledged Judge Wettick's decision in this regard by making payments of principal and interest totalling $503,295 in 1993, $603,258 in 1994, $627,430 in 1995, approximately $622,360 in 1996, and approximately $204,618 for 1997.[12] *See* Exhibit TCI-3.[13] From 1990 to 1992 the debtor, pursuant to terms of the Daiwa obligation, had made interest-only payments. The debtor apparently borrowed from Elmhurst and Traders to assist it in making the aforementioned interest-only payments. *See Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 3 (Pa.Com.Pl. 1993) ("Debt service was current as of September 30, 1992 only because Elmhurst and Traders made additional contributions to Valleybrook Partnership [(ie., the debtor)].").

The debtor has posted net "book" losses for each year of its existence. *See* Exhibits E–9 to E–21 & TCI–6 to TCI–7; *see also Elmhurst Co., L.P. v. Meyers, et al.,* No. GD91–00574 at 3 (Pa.Com.Pl.1993) (with limited exceptions, the debtor has lost money from May 1990, when it commenced operations, until March 16, 1993). Furthermore, the profitability of the debtor's operations appears to have deteriorated since 1994, as reflected by the debtor's "book" numbers for gross profit and net income between 1994 and the present: 1994, gross profit of $4.43 million and net loss of $47,286, *see* Exhibit E–13, p. 7; 1995, gross profit of $4.34 million and net loss of $99,008, *see* Exhibit E–14, p. 7; 1996, gross profit of $4.14 million and net

loss of $219,047, *see* Exhibit E–15, p. 2; and 1997, gross profit of $3.52 million and net loss of $841,504. *See* Exhibit E–19, pp. 5 & 8.

## DISCUSSION

### I. Whether the debtor is generally not paying its debts as they become due?

 Because Traders contests Elmhurst's filing of an involuntary petition on behalf of the debtor, this Court may not grant an order for relief unless "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute." 11 U.S.C.A. § 303(h)(1) (West 1993). Elmhurst, as the petitioning general partner, has the burden of demonstrating that the debtor is generally not paying its debts as they become due. *See* 2 *Collier on Bankruptcy,* para. 303.14[1][e] at 303–83 (Bender 1998). Traders has the burden of demonstrating that the debts in question are subject to a bona fide dispute. *See Id.*

 The language of § 303(h)(1) "is not defined in the [Bankruptcy] Code and the legislative history is not very helpful." *In re All Media Properties, Inc.,* 5 B.R. 126, 142 (Bankr.S.D.Tex.1980), *aff'd,* 646 F.2d 193 (5th Cir.1981). As a consequence, "courts have been unable to arrive at a uniform standard for determining what constitutes a failure to pay debts generally." *In re Midwest Processing Co.,* 41 B.R. 90, 100 (Bankr.D.N.D. 1984). However, although most courts have engaged in a mechanical analysis involving the review of numerous factors, *see, e.g, In re*

---

**12.** Traders and Elmhurst continue to disagree over the proper amount of the instalment payments that the debtor should be making on its obligation to Elmhurst. The dispute involves not only the proper rate that should be utilized to calculate the interest which Elmhurst's claim bears, but also the proper method by which Elmhurst's principal is amortized.

**13.** Because the Court did not have complete information regarding principal and interest payments in 1996 and 1997, the Court estimated amounts for these two years as follows:

1996: $180,000 principal (Ex. E–17, p. 8 (Note 3))
 + [$204,166 interest, 1st 24 weeks of 1996 (Ex. TCI–3)
 × 52/24]
 $622,360

1997: $60,000 principal (Ex. E–17, p. 9 (Note 3))
 + [$204,166 interest, 1st 24 weeks of 1996 (Ex. TCI–3)
 × 17/24]
 $204,618

*Knoth,* 168 B.R. 311, 317 (Bankr.D.S.C.1994) (factors to consider are "(1) the timeliness of payments on past due obligations; (2) the amount of debts long overdue; (3) the length of time during which the debtor has been unable to meet large debts; (4) any reduction in the debtor's assets; and (5) the debtor's deficit situation"); *In re H.I.J.R. Properties Denver,* 115 B.R. 275, 277 (D.Colo.1990) (listing as factors the number of debts, the amount of the delinquencies on said debts, the materiality of nonpayment, and the nature of the debtor's conduct with respect to his financial affairs), courts appear to be uniform in their belief that they "should not restrict ... [themselves] solely to factors included in a mechanical test." *See, e.g., Midwest Processing,* 41 B.R. at 100 ("Accordingly, courts must be sensitive to the unique circumstances involved in each involuntary proceeding."); *H.I.J.R. Properties,* 115 B.R. at 277 (courts should "look[ ] to the 'totality of the circumstances existing when the petition [was] filed' "); *All Media Properties, Inc.,* 5 B.R. at 142 ("the ... [present] test for involuntary petitions was adopted not to restrict and limit the involuntary process but was included to allow more flexibility"); 2 *Collier on Bankruptcy,* para. 303.14[1][b] at 303–80 to 82 (listing numerous additional factors that are sometimes considered by courts). As a corollary to the previous statement, no one factor should generally merit more importance than others in a court's analysis; instead, which factors take priority should depend on the circumstances that are presented to a court.

With respect to the instant case, the Court notes that the debtor, who was obligated to make monthly principal and interest payments on the $5.7 million obligation to Elmhurst, has not made any such payments to Elmhurst since May 1997 when Elmhurst assumed responsibility for the debtor's daily operations. Traders contends that, even if Elmhurst is not being paid in a timely manner on its $5.7 million claim, an order for relief may not be entered herein because (a) as a matter of law, failure to pay a single creditor can never support a finding that a debtor is generally not paying its debts as they become due, and (b) Elmhurst represents the lone undisputed and unpaid credi-

tor in the instant case. Additionally, Traders argues that the debtor has generally been paying the remainder of its creditors as their claims become due. Traders also contends that the debtor's obligation to Elmhurst may be ignored for purposes of § 303(h)(1) because said obligation is the subject of a bona fide dispute. Finally, and for what it is worth, Traders contends that, while it was in control of the debtor's daily operations, the debtor was generally paying its debts as they became due. The Court takes issue with each of the preceding arguments.

### A. Whether the failure to pay a single creditor can support a finding that a debtor is generally not paying its debts as they become due?

Traders is certainly correct that substantial case authority exists for the prohibition against involuntary petitions where only a single unpaid creditor exists. *See, e.g., In re Nordbrock,* 772 F.2d 397, 399 (8th Cir. 1985); *In re Smith,* 123 B.R. 423, 425 (Bankr.M.D.Fla.1990); *In re Gold Bond Corp.,* 98 B.R. 128, 129 (Bankr.D.R.I.1989). However, the preceding cases, as well as others that hold in a similar fashion, are not binding upon this Court. Furthermore, this Court is aware of at least one recent case that unconditionally rejects the rationale of those courts that categorically prohibit involuntary petitions in single creditor cases. *See In re Fischer,* 202 B.R. 341, 346–48 (E.D.N.Y.1996); *see also In re Concrete Pumping Service,* 943 F.2d 627, 630 (6th Cir.1991) (also questioning the categorical prohibition against involuntary petitions in single creditor cases).

Moreover, numerous courts, even if they apparently accept the doctrine generally prohibiting involuntary petitions in single creditor cases, nevertheless recognize several exceptions to the general rule. One of these exceptions, although not usually characterized formally as such, involves the situation where a debtor, while paying its smaller periodic payments as they become due, is unable, and thus fails, to timely satisfy one or two of its debts that constitute a substantial percentage of its overall obligations; such a scenario can support a finding that a debtor

is failing to pay its debts as they become due for purposes of § 303(h)(1). *See Fischer*, 202 B.R. at 350–51; *In re Garland Coal & Mining Co.*, 67 B.R. 514, 522 (Bankr.W.D.Ark. 1986); *Matter of Hill*, 5 B.R. 79, 83 (Bankr. D.Minn.1980); *Matter of International Teldata Corp.*, 12 B.R. 879, 882–83 (Bankr. D.Nev.1981); *Midwest Processing*, 41 B.R. at 100; *Matter of B.D. International Discount Corp.*, 15 B.R. 755, 763 (Bankr.S.D.N.Y.1981), *aff'd*, 24 B.R. 876 (S.D.N.Y.1982), *aff'd*, 701 F.2d 1071 (2nd Cir.1983). This exception would certainly seem to apply in the instant case since the annual payments to Elmhurst approximate $600,000 annually, which is unquestionably among the largest of the debtor's annual obligations.

■ Finally, there is no merit to, and this Court will not accept, the argument that a debtor can distinguish between ordinary and extraordinary debts and avoid § 303(h)(1) by "generally paying his ordinary debts as they fall due" and only being "delinquent in regard to [his] 'extraordinary' debts." *See In re Bowers*, 16 B.R. 298, 303–04 (Bankr. D.Conn.1981). Stated another way, this Court will not condone the efforts of a debtor who seeks to take advantage of the general prohibition on involuntary petitions in single-creditor cases by ensuring payment to all, or most, of its smaller periodic debt to the exclusion of larger long-term debt. Without necessarily attributing to the instant debtor any guilt, the Court must nonetheless recognize that the debtor has endeavored to continue making payments to its trade creditors to the conspicuous exclusion of Elmhurst's claim over the past year. Given the sheer size of the missed payments by the debtor in the past year with respect to Elmhurst's claim, this Court can safely conclude that, if several or all of them had been made, then numerous trade creditors would have been neglected during the same period.

On the basis of all of the above, the Court can, and does, readily conclude that the debtor herein is not generally paying its debts as they become due.

**B. Whether the debtor has generally been paying the remainder of its creditors as their claims become due?**

■ The Court also finds that the debtor has not generally been paying the remainder of its creditors as their claims become due. As support for this finding, the Court notes that Elmhurst has directly infused substantial amounts of cash—in particular, $1,046,700—into the debtor over the past year via "excess" operating loans. Although $786,057 remains in the debtor's cash reserves as of May 2, 1998, the Court can safely conclude that approximately $200,000 of the loaned funds must have been utilized to pay trade creditors.[14] That the debtor utilized at least a portion of the aforementioned $1,046,700 to pay trade creditors is also supported by the fact that the debtor was overdrawn on its bank accounts when Elmhurst commenced infusing cash into the debtor in May 1997. Furthermore, and as mentioned previously, the debtor, at the direction of Elmhurst via Elmhurst's control over the debtor's daily operations, postponed its monthly instalment payments to Elmhurst on the $5.7 million obligation to Elmhurst. The deferral of monthly payments on this obligation over the past year has essentially resulted in, or constitutes, an indirect loan of approximately $600,000 to the debtor during the same period. The Court believes that it is a fair conclusion that Elmhurst, on behalf of the debtor, would not have forewent prompt satisfaction of the monthly payments due on its claim unless said $600,000 was needed to satisfy trade debt. Therefore, approximately $800,000 of the debtor's debts in the past year appear to have been satisfied by funds that Elmhurst loaned, either directly or indirectly, to the debtor.

■ These observations and conclusions by the Court are significant because "[p]ayments of a debtor's obligations by a third party are not treated as payment by the debtor himself." *Knoth*, 168 B.R. at 317; *see*

---

**14.** $1,046,700 ("excess" funds loaned to the debtor by Elmhurst in past year) − $786,057 (remains in the debtor's cash reserves at 5/2/98) − $211,077 (fixed assets improvements during the past year) + $150,000 (approximate cash generated by changes in accounts payable, accounts receivable, inventories, and prepaid assets) = $199,566, or approximately $200,000.

*also H.I.J.R. Properties,* 115 B.R. at 277–78 and note 3; *Midwest Processing,* 41 B.R. at 101; *B.D. International Discount,* 15 B.R. at 763; *In re Central Hobron Associates,* 36 B.R. 111, 116 (Bankr.D.Hawaii 1983), *rev'd on other grounds,* 41 B.R. 444 (D.Haw.1984); *International Teldata,* 12 B.R. at 882.[15] Furthermore, since Elmhurst is only a general partner of the debtor and not the debtor itself, and because Elmhurst is required to lend to the debtor, at most, $60,000 annually pursuant to the partnership agreements, Elmhurst's additional cash infusions must be considered by this Court for purposes of this matter to be third party payments of the debtor's obligations. Consequently, the Court must conclude that the debtor itself has not, for the past year, generally been paying a significant portion of its debts as they become due.

### C. Whether the debtor's obligation to Elmhurst is the subject of a bona fide dispute so that it may be ignored for purposes of § 303(h)(1)?

■ Traders contends that, even if Elmhurst has not received instalment payments during the past year on its $5.7 million claim, that fact is irrelevant to this Court's analysis under § 303(h)(1) because (a) debts that are the subject of a bona fide dispute are excluded from the analysis under § 303(h)(1), and (b) Traders asserts that its obligation to Elmhurst is the subject of a bona fide dispute. This Court wholeheartedly disagrees with this argument by Traders, however, and shall dispose of it in quick fashion.

■ Debts are subject to bona fide dispute " 'if there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.' " *B.D.W. Associates v. Busy Beaver Building Centers,* 865 F.2d 65, 66–67 (3rd Cir.1989) (citing and following *In re Lough,* 57 B.R. 993, 997 (Bankr.E.D.Mich.1986), with the gloss in *In re Busick,* 831 F.2d 745 (7th

Cir.1987), that " 'substantial' factual and legal questions raised by [a] debtor preclude [a] finding of involuntary bankruptcy"). Nevertheless, to eliminate a creditor's claim entirely from the analysis called for in § 303(h)(1), "the bona fide dispute must go to the entire claim." 2 *Collier on Bankruptcy,* para. 303.03[2][b][iii] at 303–24 to 25 (expanding upon the definition of "bona fide dispute" for purposes of 11 U.S.C. § 303(b)(1)); *Id.* at para. 303[2][b] at 303–22 (" 'bona fide dispute' has been given the same meaning by courts whether it is used in section 303(b) or (h)"). While the Court agrees that a bona fide dispute exists herein as to the proper rate that should be utilized to calculate the interest which Elmhurst's claim bears, as well as the proper method for amortization of Elmhurst's principal, *see supra* note 12, Traders concedes and/or Judge Wettick has already held on numerous occasions during the parties' litigation in state court, that the debtor (a) is obligated to Elmhurst in the principal amount approximating $5.7 million, and (b) must make monthly payments of principal and interest to Elmhurst in an amount which at least rivals that which the debtor had been paying up until May 1997. *See supra* pp. 483–84 & 485–86. Therefore, a bona fide dispute clearly does not exist with respect to the obligation of the debtor herein to make monthly payments to Elmhurst totalling approximately $600,000 annually, and said debt is appropriately subject to this Court's consideration for purposes of § 303(h)(1).

### D. The relevance, if any, of Traders' contention that, while it was in control of the debtor's daily operations, the debtor was generally paying its debts as they became due?

■ The Court is cognizant of, and needs to make several comments regarding, Traders' contention that, while it was in control of the debtor's daily operations, the debtor was generally paying its debts as they became due.

---

**15.** This particular legal doctrine nullifies the cash "burn-rate" analysis offered by Traders' expert witness, *see* Exhibit TCI–5, because said witness, who concluded that the debtor had sufficient cash to last for anywhere from 35 to 124 weeks without payment of interest, predicated his analysis upon the debtor's present cash position of $786,057 as having been funded by the debtor itself. Since the funds must be viewed as those of a third party, however, the debtor is more appropriately viewed as presently unable to fund payment of much of its debt.

First, if Traders, by offering this statement, means to imply that Elmhurst has essentially staged the aforementioned circumstances so as to prevail at this time with respect to the instant involuntary petition, this Court simply cannot agree with such an assertion. Although Elmhurst has controlled the debtor's daily operations over the past year, which includes the first few months of the instant bankruptcy case, Elmhurst, on behalf of the debtor, has conspicuously failed to pay itself with respect to its own claim during said period. Given the tenuous nature of the present proceedings involving the involuntary petition that Elmhurst filed on the debtor's behalf, the Court would expect that, had Elmhurst truly been motivated by its own self-interest, it would have endeavored to accelerate, rather than discontinue, payment of its own claim during the past year. Furthermore, given that Elmhurst is already on the hook, so to speak, for approximately $5.7 million via its acquisition of the obligation from Daiwa, the Court simply cannot imagine that Elmhurst would seek to gain an improper advantage in these proceedings by speculatively (a) investing an additional $1,046,700 into the debtor's operations, and (b) foregoing collection of approximately $600,000 in principal and interest on its own claim.[16]

Second, given that the Court cannot accept an implicit assertion that Elmhurst has staged the present situation that has materialized in the form of these proceedings, the Court must then conclude that Traders' aforementioned statement, even if accurate, is irrelevant to the Court's analysis since the debtor, at this time, is nevertheless not generally paying its debts as they become due; it simply matters not what the status of the debtor's operations might have been approximately a year to a year and a half ago when Traders was exercising day-to-day control over said operations. If Elmhurst's management and control of the debtor's daily operations is a meaningful and actionable cause of the debtor's present financial circumstances,

then Traders is only left to pursue whatever remedy it might have under state law.

Third, the Court must also take note of the nature of the debtor's conduct with respect to its financial affairs during the period in which Traders exerted exclusive control over the debtor's daily operations. In particular, the Court must observe that the debtor (a) was practically out of cash at the end of 1996 and overdrawn immediately prior to Elmhurst's assumption of control over the debtor's daily affairs, (b) had not ever turned a book net profit since its inception in 1990, (c) was not able to make interest-only payments on the Daiwa obligation in 1990–92 without aid from both Elmhurst and Traders via the $60,000 operating loan calls, and (d) had made insubstantial capital expenditures in the four and one-half years preceding Elmhurst's assumption of responsibility for the debtor's daily operations. Each of these points convinces this Court that the debtor, even prior to May 1997, was merely living on borrowed time, if not borrowed funds.

### CONCLUSION

The debtor herein is not generally paying its debts as they become due because (a) it has failed to make any payments of either principal or interest on the $5.7 million obligation due to Elmhurst within the past year, (b) such failure is substantial given that approximately $600,000 in instalment payments were due on said obligation during this period, (c) Elmhurst's deferral, on behalf of the debtor, of payment of the $600,000 in instalment payments to itself constitutes an indirect loan to the debtor in the same amount, (d) said $600,000 loan, along with at least $200,000 of an additional direct "excess" loan from Elmhurst, was utilized by the debtor to pay its other debts within the past year, and (e) the debtor's payment of its debts with funds obtained from third parties such as Elmhurst do not constitute payments by the debtor itself for purposes of § 303(h)(1). Furthermore, a bona fide dispute clearly does not exist with respect to the obligation

---

**16.** Such a scheme is all the more implausible given that Elmhurst's collateral, obtained via its acquisition of the $5.7 million obligation from Daiwa, was objectively valued at substantially less than $5.7 million as of July 1994. See Elm-

hurst Co., L.P. v. Meyers, et al., No. GD91–00574 at 6 & 8 note 6 (Pa.Com.Pl.1997) (citing testimony that Judge Wettick found to be credible regarding Elmhurst's efforts to refinance the $5.7 million obligation).

of the debtor herein to make monthly payments to Elmhurst totalling approximately $600,000 annually, and said debt is thus appropriately subject to this Court's consideration for purposes of § 303(h)(1). Finally, the Court cannot accept an implicit assertion that Elmhurst has staged the present situation that has materialized in the form of these proceedings, which means that Traders' contention that, while it was in control of the debtor's daily operations, the debtor was generally paying its debts as they became due, is simply irrelevant at this time even supposing that it might be accurate. Consequently, an order for relief shall be entered against the debtor herein.

An appropriate order will be entered.

### ORDER OF COURT

**AND NOW,** this **22nd day** of **July, 1998,** upon consideration of the de facto involuntary petition filed by Elmhurst Corporation (hereafter "Elmhurst") on behalf of the Food Gallery at Valleybrook, the above-captioned debtor; and in light of the answer to said involuntary petition by Traders Crossing, Inc. (hereafter "Traders"); and in particular consideration of whether an order for relief should be granted against the debtor, which, pursuant to 11 U.S.C. § 303(h)(1), necessitates a determination as to whether the debtor is generally not paying its undisputed debts as they become due; and after consideration of the parties' briefs submitted in support of their respective positions, along with accompanying exhibits and relevant documents; and subsequent to a trial on the matter held on May 4, 1998 and July 6-7, 1998; and in accordance with the accompanying memorandum opinion of this Court dated July 22, 1998, it is **hereby ORDERED, ADJUDGED, AND DECREED** that (a) the debtor is **GENERALLY NOT PAYING ITS DEBTS** as they become due, (b) **RELIEF IS ORDERED AGAINST THE DEBTOR,** and (c) Traders' counterclaim under 11 U.S.C. § 303(i) is **DISMISSED WITH PREJUDICE** since it is rendered moot by the order for relief granted herein against the debtor.

Additionally, the Court shall **DEFER** its decision regarding whether Elmhurst, which holds a substantial secured claim against the debtor, can subsequently (a) bid at a sale under 11 U.S.C. § 363(b) of the debtor's property which constitutes Elmhurst's collateral, and (b) offset (ie., credit-bid) Elmhurst's secured claim against Elmhurst's bid price pursuant to 11 U.S.C. § 363(k). The Court anticipates that it will resolve the "credit-bidding" issue in conjunction with its future consideration of Traders' motion, pursuant to 11 U.S.C. §§ 1112(b) and 305(a), to dismiss the present bankruptcy case for cause. A hearing will be scheduled shortly for Traders' aforementioned dismissal motion.