**In re HENTGES, Michael E., Alleged Debtor.**

**No. 05–30076–R.**

United States Bankruptcy Court, N.D. Oklahoma.

April 18, 2006.

26. KAN. STAT. ANN. § 84–9–317(a)(2) (2003 Supp.).

Stephen J. Capron, Capron & Edwards, P.C., Tulsa, OK, for Alleged Debtor.

Robert S. Glass, R. Charles Wilkin, III, Brian L. Mitchell, Glass Law Firm, P.C., Tulsa, OK, for Petitioning Creditor Virginia D. Marks.

James R. Hicks, Morrel, West, Saffa, Craige & Hicks, Inc., Tulsa, OK, for Petitioning Creditor Paul R. Hodgson.

Michael James King, Winters, King & Associates, Inc., Tulsa, OK, for Petitioning Creditor Tulsa National Bank N.A.

## ORDER DENYING APPLICATION OF COUNSEL OF INVOLUNTARY DEBTOR FOR COMPENSATION AND REIMBURSEMENT OF ATTORNEYS' FEES

DANA L. RASURE, Bankruptcy Judge.

■ Before the Court is the Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees (Doc. 48) filed by Stephen J. Capron ("Capron") and Cy Northrop ("Northrop") (collectively "Counsel") on February 21, 2006 (the "Application"); Petitioning Creditor, Paul R. Hodgson's Objection to Application for Compensation and Reimbursement of Attorneys' Fees (Doc. 51) filed on March 7, 2006; the Objection of Virginia Marks and Tulsa National Bank to Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees (Doc. 53) filed on March 9, 2006; the Corrected Reply to Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees (Doc. 58) filed by Counsel on March 27, 2006; and the Petitioning Creditors' Trial Brief (Doc. 61) filed on March 27, 2006. A hearing on the Application was held on March 30, 2006. The Court takes judicial notice of the prior proceedings in this case, including the trial on the involuntary petition held on January 26, 2006.

Upon consideration of the record, the pleadings, the evidence presented at the trial on January 26, 2006, and the hearing on March 30, 2006, the briefs and arguments of counsel, and applicable law, the Court finds and concludes as follows:

## I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A) and (O); and Local Civil Rule 84.1(a) of the United States

District Court for the Northern District of Oklahoma.

## II. Procedural history

On December 21, 2005 (the "Petition Date"), Petitioning Creditors Virginia D. Marks, individually and as Trustee of the Virginia D. Marks Trust (collectively "Marks"), Paul R. Hodgson ("Hodgson"), and Tulsa National Bank (the "Bank") (collectively the "Petitioning Creditors") filed an involuntary petition (Doc. 1) against Michael E. Hentges ("Hentges"), requesting that an order for relief under Chapter 7 of the Bankruptcy Code be entered against Hentges. Because the petition erroneously indicated that Tulsa National Bank had a judgment against Hentges, the Petitioning Creditors filed an Amended Involuntary Petition (Doc. 3) ("Amended Involuntary Petition") on December 22, 2005, which corrected the error and indicated that Tulsa National Bank had a claim against Hentges rather than a judgment. The Amended Involuntary Petition was served on Hentges.

On January 11, 2006, Hentges filed the Answer of Debtor to Involuntary Petition *pro se* (the "Answer") (Doc. 23). In his Answer, Hentges admitted that he was indebted to Hodgson pursuant to a judgment in the amount of $8,561.02 plus interest thereon; admitted that he was indebted to Marks pursuant to a judgment in the amount of $185,000 plus post-judgment interest, but claimed that Marks was indebted to Hentges pursuant to unliquidated claims Hentges had asserted against Marks arising from Marks's attempts to collect her judgment and therefore Marks's judgment was subject to setoff; and denied that he was indebted to the Bank "as evidenced by his verified answer of denial filed in the District Court of Tulsa County."[1] In his Answer, Hentges did not deny the Petitioning Creditors' allegation that he was "generally not paying ... debts as they become due, unless such debts are subject of a *bona fide* dispute as to liability or amount." Amended Involuntary Petition at ¶3(a). Hentges did assert that he had more than twelve creditors.[2]

After a trial on the merits, the Court issued a bench ruling in which it determined that a portion of the Bank's claim was in *bona fide* dispute. Notwithstanding Hentges's Answer, the Court found that there was no *bona fide* dispute that as guarantor of a promissory note executed by Michael E. Hentges, Inc. ("MEH, Inc."), Hentges owed the Bank principal of $29,400.00.[3] However, in the Amended In-

---

1. The Bank filed its Petition on Promissory Note, Guaranty and Foreclosure of Security Interest (the "Petition on Guaranty") in Tulsa County District Court on September 20, 2005. As of January 11, 2006, Hentges had not filed any answer, verified or otherwise, to the Petition on Guaranty.

2. A single qualifying petitioning creditor may commence an involuntary case against a debtor if the debtor has fewer than twelve creditors. 11 U.S.C. § 303(b)(2).

3. Hentges asserted at trial that because the Bank and the MEH, Inc. extended the note on various occasions, Hentges was exonerated as guarantor pursuant to 15 O.S. § 338. Under the terms of the Guaranty, however, Hentges expressly and unambiguously waived any and all defenses that would arguably arise under Section 338. The Oklahoma Supreme Court has declared such written express waivers enforceable. *See First Nat'l Bank and Trust Co. v. Kissee*, 1993 OK 96, 859 P.2d 502, 508. Thus, there is no merit to Hentges's claim that he was exonerated of liability on the Guaranty.

Hentges also contended that he was no longer liable on the Guaranty because MEH, Inc. and the Bank had a entered into a settlement that superseded the Guaranty. There was no evidence that there was a meeting of the minds with respect to the amount of or terms of a settlement. Even if MEH, Inc. and

voluntary Petition, the Bank asserted a claim in the amount of $39,253.15. At trial, Hentges asserted (and the Bank did not deny) that approximately $8,500.00 of the $39,253.15 claim consisted of attorney fees and expenses incurred by the Bank in connection with responding to subpoenas and garnishment summonses issued by Marks in connection with attempts to collect her judgment, which was entered solely against Hentges (and not against MEH, Inc.). The Court found that because the Note and Guaranty did not unambiguously provide that the Bank could recover from MEH, Inc. expenses arising from collection activities related to Hentges as an individual, the Bank did not establish that such expenses were included in the debt guaranteed by Hentges. Therefore, the Court found that the *amount* of Hentges's debt to the Bank was in *bona fide* dispute. *See* Transcript of February 1, 2006, Bench Ruling, Doc. 46, at 6. Thus, the Court concluded that the Bank did not qualify as a petitioning creditor, and in the absence of three qualified petitioning creditors, the involuntary petition was dismissed. *Id.* at 7.

On February 3, 2006, the Petitioning Creditors filed a Joint Motion to Reconsider (Doc. 39), arguing that a *bona fide* dispute must exist as to the entire claim, not merely a portion of the claim, before a creditor is disqualified as a petitioning creditor. Because the Court had considered that legal argument and the authorities cited by the Petitioning Creditors prior to issuing its order dismissing the involuntary petition, and concluded that its interpretation of Section 303(b)(1) of

the Bankruptcy Code, as recently amended by Congress, was correct, the motion to reconsider was denied. Order Denying Motion to Reconsider (Doc. 41). In the Order Denying Motion to Reconsider, the Court stated that "if the bank had asserted a claim for the principal and interest due on the obligation guaranteed by Mr. Hentges, an amount not disputed by Mr. Hentges, the Court might have reached a different conclusion." *Id.* at 3.

On February 21, 2006, Counsel filed their Application pursuant to Section 303(i) of the Bankruptcy Code seeking to recover fees on behalf of Hentges pursuant to subsection (1) of Section 303(i) and requesting that the Court abstain from considering damages arising from the involuntary petition under subsection (2) of Section 303(i), so that such damages may be liquidated in a pending state court action Hentges had filed against Marks. On March 23, 2006, the Court entered an order denying Hentges's request for abstention and set the Application for hearing on the issue of the Petitioning Creditors' alleged bad faith and on the issue of reasonableness of the fees sought by Counsel. Doc. 56. The issue of damages was reserved to be heard at a later date in the event Hentges prevailed in proving the predicate for awarding such damages, *i.e.*, that the Petitioning Creditors filed the Amended Involuntary Petition in bad faith.

### III. Findings of fact[4]

#### A. *Petitioning Creditor Marks*

■ For many years prior to October 2005, Hentges was a licensed insurance

---

the Bank did reach a settlement as to the amount of the debt and terms for payment, there is no evidence that as part of the settlement, the Bank released Hentges from his Guaranty. Again, Hentges did not produce evidence of a meritorious defense to his *liability* on the Guaranty.

Moreover, at trial, Hentges admitted owing at least $29,400 to the Bank.

4. Because resolution of the Application requires consideration of prior proceedings, the Court adopts the Court's prior findings of fact and conclusions of law, as set forth in the

producer and financial planner. Over the course of approximately twenty years, Hentges sold insurance to Marks, a 74 year old retired school teacher, and her 81 year old husband, and also advised them in investment matters. Order Revoking License of Michael Edmund Hentges, Marks Exhibit 5.[5] In September 2003, Hentges approached Marks seeking to borrow $25,000. *Id.* at 2. Hentges advised Marks that she had $200,000 available from a life insurance policy that he had sold to her and also told her she could cash in certificate deposits in order to loan him money. *Id.* Hentges's lawyer, Cy Northrop, drafted a note payable in three months at an interest rate of five percent per month (*i.e.*, sixty percent annually). *Id.* Marks agreed to loan $25,000 to Hentges on the terms dictated by Hentges. *Id.* Hentges instructed Marks to make her $25,000 check payable to 76PW, LLC, an entity related to Hentges, whose only tangible asset was a fully encumbered airplane.[6] *Id.* Notwithstanding that all principal and interest was due to Marks in January 2004, no payment was made on the loan until a partial payment was made in January 2005; the balance of the principal was paid in June 2005. *Id.* There is no evidence that Marks was paid any interest on that loan. Hentges refused to pay interest at the rate he himself had proposed to Marks, claiming that it was illegal.

Between September 2003 and January 2004, Hentges and/or his entities borrowed an additional $175,000 from Marks, for which he gave her three notes from another entity, Real Estate Marketing Services, LLC ("REMS") (the "REMS Notes"). *Id.* Northrop also drafted the REMS Notes. Hentges guaranteed payment of the REMS Notes. REMS and Hentges promised to pay interest of two percent per month (twenty-four percent annually) on two of the notes and eight percent annually on one note. Upon receipt of the last loan of $100,000 from Marks, REMS immediately transferred $100,000 to another Hentges-related entity, RNH, LLC, which also owned an airplane, thus dissipating the assets of REMS. *Id.* These notes were not paid as promised by REMS or by Hentges. *Id.* On April 1, 2005, Hentges deemed REMS "not viable" and caused it to be dissolved. *Id.* at 3.

After attempting to collect the notes herself by making repeated calls to Hentges, Marks retained the Glass Law Firm to assist her in collecting the notes. *Id.* At some point, Marks complained of Hentges's conduct to the Oklahoma Insurance Commissioner. By a letter dated June 27, 2005, Hentges's counsel, Cy Northrop, advised Marks that while he would work with her in "an effort to get these debts paid," Hentges was "financially unable to make

procedural history section of this Order, as findings and conclusions in this proceeding as well.

**5.** At the hearing on the Application, the Court took under advisement Hentges's objection to the admission of the Order Revoking License of Michael Edmund Hentges, Marks Exhibit 5, contending that it was not properly authenticated. Marks's counsel submitted to the Court a copy of the order containing a signed and sealed certification by an agent of the Insurance Commissioner of the State of Oklahoma that the "foregoing is a true, correct and complete copy of the instrument herewith

set out as appears of record in the Oklahoma Insurance Department this 28th day of March 2006." Because this certification complies with Rule 902(1) and (4) of the Federal Rules of Evidence, further evidence of authenticity is not required. *See also* Fed.R.Evid. 1005. Therefore, Marks Exhibit 5 is admitted.

**6.** On June 1, 2005, Hentges, as Manager of 76PW, LLC, filed a voluntary petition in this district under Chapter 7 of the Bankruptcy Code on behalf of 76PW, LLC. *See In re 76PW, LLC,* Case No. 05–13449–R (Bankr. N.D.Okla). *See also* Marks Exhibit 5 at 3.

payment at this time," "if he looses [sic] his license to sell insurance, his future ability to pay will be severely impaired," "[h]e will not pay the usurious and other high interest rates called for in the notes," "[h]e will not make a partial payment on a past due note," and "[h]e will not pay if he gets sued." Hentges Exhibit 1 (the "Northrop Letter"). Northrop also advised that if Marks did not accept these terms, she "will never get paid." *Id.* Northrop proposed that Marks surrender the four existing notes and acknowledge them as "paid in full," proposed to recalculate the balances using an interest rate of eight percent to arrive at an agreed sum due, and proposed that Hentges would execute a new note in favor of Marks in the amount of the "agreed sum" payable in twelve quarterly installments at six percent.

Not surprisingly, Marks chose not to "accept the terms" of the Northrop Letter. Instead, she filed a lawsuit against Hentges, 76PW, LLC, REMS and Columbus Life Insurance Company in Tulsa County District Court in order to reduce the debt owed on the existing notes to a judgment. Hentges offered to confess judgment in the amount of $185,000 plus post-judgment interest accruing at the rate of 7.25%; Marks accepted the offer and a judgment against Hentges was entered on September 21, 2005. Judgment by Confession, Marks Exhibit 4–11.[7] Hentges voluntarily dismissed any counterclaims he had asserted against Marks without prejudice to refiling. Marks Exhibit 4–12.

On September 28, 2005, an Independent Hearing Examiner held a hearing on the Oklahoma Insurance Commissioner's complaint against Hentges. As a result of Hentges's exploitation of his relationship with Marks and another retired school teacher from whom he obtained money on behalf of himself or related entities,[8] the Oklahoma Insurance Commission revoked Hentges's license to sell insurance. Marks Exhibit 5. Hentges holds Marks responsible for the revocation of his insurance license and points to her complaint to the Insurance Commissioner as evidence of Marks' bad faith.[9] However, this Court finds, as did the Insurance Commissioner, that Marks was a victim of Hentges's predatory and dishonest practices and his breaches of fiduciary duty, and was not the

7. Marks Exhibit 4 is the collection of "All Exhibits admitted at trial conducted on January 26, 2006." At the trial, the Court admitted Petitioning Creditors' Exhibits 1, 2, 3, 4, 6, 7, 8, 11, 12, 13, 19, 20, 23, 27, 28, and 29. The Court will refer to the trial exhibits as Marks Exhibit 4–x [where × equals the trial exhibit number].

8. The Hearing Officer found that Hentges enticed Ms. Janice Kelly to invest over $160,000 of the proceeds of the sale of her home in 76PW, LLC, and promised she would recover that sum plus ten percent interest in two years. Marks Exhibit 5 at 4. The Hearing Officer further found that Hentges used the funds invested by Ms. Kelly for purposes other than those represented by Hentges. *Id.* The findings indicate that Hentges transferred funds from 76 PW, LLC to pay the debts of other entities owned or managed by Hentges.

9. Hentges contends that Marks's complaint to the Insurance Commissioner demonstrates an intent to harass and embarrass him rather than any intent to legitimately collect a debt. Had the Hearing Officer concluded that Marks's complaint had no merit, the Court might find evidence of ill will or harassment, but the Hearing Officer found by clear and convincing evidence that Hentges breached fiduciary duties to Marks and Ms. Kelly, that he was dishonest, incompetent and exploitative, and that he attempted to coerce Marks into not testifying against him. Victims of unethical or unlawful practices or breaches of duty are justified in bringing such practices to the attention of the licensing authorities as a service to the public and the Court will not infer any bad faith from Marks's reports or testimony to the Insurance Commissioner.

wily architect of Hentges's financial collapse, as Hentges contends.

■ After obtaining the Judgment by Confession, Marks's attorneys took aggressive steps to collect the judgment, including post-judgment discovery and garnishment. At the Insurance Commission hearing, Hentges provided testimony regarding his relationships with various insurance companies and financial institutions which information Marks's attorney's used to attempt to locate assets of Hentges (such as commissions or other receivables) by issuing subpoenas and garnishments in an effort to collect the judgment. Hentges contends that Marks's issuance of subpoenas and garnishments to all of his business contacts and financial institutions evidences Marks's intent to harass and embarrass Hentges rather than an intent to collect the judgment.[10] The Court rejects that characterization of Marks's post-judgment collection activities. Hentges had consistently proven himself to be unwilling to voluntarily honor his obligations to Marks, and Marks had been advised by Hentges's lawyer that Hentges "will not pay if he gets sued." In addition, the Hearing Officer found that Hentges had transferred assets between certain entities he owned or managed (*i.e.*, from REMS to RNH, LLC, and from 76 PW, LLC to other entities). Hentges has also testified that he has transferred assets to his wife "to defray a divorce." Marks was justified in employing counsel to aggressively attempt to locate and seize assets before

Hentges had the opportunity to dissipate or transfer them in order to avoid paying the judgment.

In November 2005, Marks's garnishments appeared to bear fruit. Bank of America possessed over $400,000 in funds in a REMS account on which Hentges was an authorized signatory.[11] Bank of America answered the garnishment summons and segregated $185,000. Hentges objected to the garnishment, contending that he had no interest in the funds and that REMS (or its successor) held the assets in escrow for a client. In addition, Hentges filed a lawsuit against Marks in part upon her "wrongful garnishment" of the Bank of America account. After proceedings in this Court and in Tulsa County District Court, Marks was apparently satisfied that the funds were not available to satisfy the judgment against Hentges. In an astounding display of hypocrisy, Hentges now contends that the fact that Marks "gave up" those funds is evidence that Marks engaged in a pattern of conduct designed to harass and embarrass Hentges rather than to collect the judgment. Again, the Court rejects Hentges's interpretation of Marks's collection efforts. After assessing the facts and the law, Marks's attorneys could have reasonably concluded that they would not prevail in convincing the Tulsa County District Court that the funds in the REMS escrow account should be deemed Hentges's funds.

■ As stated above, in November 2005, Hentges filed a lawsuit against Marks and

---

10. Hentges also contends that Marks's failure to conduct a "Section 842 asset hearing" of Hentges indicates that Marks was not interested in collecting her judgment but was solely interested in harassing Hentges. First, Marks did depose Hentges regarding his assets in November 2005. Second, Marks already had information regarding potential commission receivables from the Insurance Commission hearing. Finally, there is no re-

quirement that a judgment creditor conduct an asset hearing before conducting other discovery when attempting to collect a judgment.

11. The Court notes that at this point, REMS, which owned the account, had been "dissolved." Thus, the ownership of the funds was legitimately in question.

her attorneys (as well as Ms. Kelly and Bank of America). In his First Amended Petition, filed December 12, 2005, Hentges asserted claims against Marks for wrongful garnishment, defamation, intentional infliction of emotional distress, abuse of process, malicious prosecution, and intentional/tortious interference with contractual relations, all arising out of Marks's attempts to collect her judgment. First Amended Petition, Marks Exhibit 4–28. Marks's Motion to Dismiss the lawsuit is pending.[12]

Later in December 2005, Marks joined Hodgson and the Bank in filing the involuntary petition against Hentges. Marks stated that she was motivated to file the involuntary petition in order to allow a trustee to investigate Hentges's financial affairs and identify and collect property for the benefit of creditors.

### B. *Petitioning Creditor Hodgson*

Hodgson is a lawyer who had represented Hentges and his related entities in 1996 and 1997. Hodgson testified that Hentges consistently did not pay debts owed to Hodgson as they came due. Hentges owed Hodgson for work performed in 1996 and 1997 and for commissions due on Hentges's sales of tax planning packages. Over the years, when Hodgson would attempt to collect the amount due, Hentges would pay a few hundred dollars in order to forestall a lawsuit, thus restarting the statute of limitations on the collection of the debt. In April 2005, Hodgson finally sued Hentges on the debt, and on August 31, 2005, a Journal Entry of Judgment was entered granting Hodgson a judgment against Hentges in the amount of $5,032.72 plus costs of $149.00, interest and attorney's fees. Marks Exhibits 4–6, 4–7. On October 4, 2005, a Journal Entry of Judgment was entered in favor of Hodgson for attorney fees in the amount of $3,199.30 and additional costs of $349.00. Marks Exhibit 4–8. Hodgson attempted to levy on accounts to collect his judgment but failed to locate any assets. Hentges has not paid anything on Hodgson's judgment. Hodgson was aware of several other judgments against Hentges and was advised that Hentges planned to file bankruptcy himself. Hodgson testified that he feared that if he succeeded in his efforts to collect his judgment and Hentges thereafter filed bankruptcy, Hodgson could be forced to return the funds he collected as a preference. Thus, Hodgson believed that it was fairer to himself and to Hentges's other creditors to join in the involuntary petition and allow a trustee to locate and distribute assets equitably to all creditors.

### C. *Petitioning Creditor Tulsa National Bank*

In August 2002, the Bank loaned $50,000 to MEH, Inc. pursuant to a promissory note. Hentges guaranteed MEH, Inc.'s debt to the Bank, including the promissory note and "all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement." Guaranty, Marks Exhibit 4–3, at 3. The promissory

---

**12.** Because the Court determined that a portion of the Bank's claim was in *bona fide* dispute, it was unnecessary to evaluate whether Hentges's lawsuit against Marks and her lawyers, which he claimed as a potential set-off to Marks's judgment, had any merit. In determining whether a petitioning creditor is qualified, the Court " 'must determine whether there is an *objective basis* for either a factual or legal dispute as to the validity of the debt.' " *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1542 (10th Cir.1988), *quoting In re Busick*, 831 F.2d 745, 750 (7th Cir.1987) (emphasis added). Nor did the Court have to determine the legal issue of whether a debtor can create a *bona fide* dispute to an unstayed unappealed judgment by filing a subsequent lawsuit against the judgment creditor.

note was renewed and restated several times and its maturity was ultimately deferred to August 2005. Marks Exhibit 4–4. Pursuant to the Guaranty, which was continuing and unlimited, Hentges authorized the Bank to "alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness." Guaranty at 1. Hentges also expressly waived a broad range of defenses, including "any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness." Guaranty at 2.

MEH, Inc. failed to pay the promissory note at maturity, and the Bank made demand for payment, but neither MEH, Inc. nor Hentges paid the note. On September 20, 2005, the Bank filed the Petition on Guaranty. As explained above, Hentges did not file an answer to the Petition on Guaranty prior to the date the Petitioning Creditors filed the Amended Involuntary Petition herein. Instead, MEH, Inc. and/or Hentges admitted owing the Bank on the Guaranty and offered to settle the lawsuit, promising to pay one-half of the debt on December 31, 2005, and one-half on March 31, 2006. In order to consider the offer, the Bank demanded that Hentges execute a consent judgment which the Bank would not present to the court unless the settlement payments were not paid when due. Paperwork was drafted by the Bank's counsel and forwarded to Hentges's lawyers but an agreement was never executed by Hentges or the Bank. Because the condition precedent to the Bank's agreement to settle the debt (delivery of a consent judgment) was not met, the Bank

was not bound to any purported settlement.[13]

Prior to joining the involuntary petition, the Bank believed that Hentges was transferring assets between entities controlled by Hentges and was concerned about the security of its collateral. The Bank concluded that collection and marshaling of assets and distribution to creditors would be more fairly accomplished by a bankruptcy trustee. Thus, the Bank joined Marks and Hodgson in bringing the involuntary petition against Hentges. After the Bank brought the involuntary petition, Hentges entered into discussions regarding payment of the Bank's debt. In such discussions, Hentges stated that while he would agree to pay the Bank, he would not agree to pay the other creditors.

The Bank's representative, Mr. Sharp, testified that the claim in the amount of $39,253.15 that was asserted in the Amended Involuntary Petition consisted of principal in the amount of $29,400.00, accrued interest, "costs the Bank incurred in providing documentary evidence in relation to another suit in which Mr. Hentges was involved," and attorneys fees and costs. As explained above, the Court found that there was no dispute as to Hentges's liability for the principal, and the amount of the principal was uncontested. Although the amounts of interest, attorney fees and costs were not quantified, Hentges failed to assert a *bona fide* defense to liability for that portion of the debt either. But Hentges did legitimately argue that "costs the Bank incurred in providing documentary evidence in relation to another suit in which Mr. Hentges

---

**13.** Hentges's own testimony indicated that there was no meeting of the minds between MEH, Inc. and the Bank as to the amount or terms of a settlement, nor was there any evidence that the purported settlement with MEH, Inc. would have exonerated Hentges on the Guaranty. Further, Hentges refused to execute the documents sent by the Bank. Further, MEH, Inc. had indicated to the Bank in December 2005 that it was unable to make the first installment payment on the purported settlement.

was involved" were not recoverable by the Bank under the terms of the Guaranty.[14]

### D. *Payment of debts*

■ At trial, the Petitioning Creditors established that Hentges was not paying certain creditors even though their debts were due. Marks Exhibit 4–27 (list of creditors being paid and not being paid pursuant to Hentges's testimony at trial). As of the Petition Date, Hentges was not paying the following debts, although they were due: Hodgson (unstayed judgment of "roughly of $9,100.00"), Marks (unstayed judgment of $185,000.00 plus interest), Capron (billings in excess of $10,000; some payments had been made by Hentges's wife),[15] Brian Wiggs (debt of approximately $9,000),[16] Phil Roland (guarantee of another entity's debt of $400,000 (possibly contingent)). With respect to debts owed on mortgages, utilities, taxes and insurance on Hentges's two homes, Hentges's wife was paying all these bills because Hentges was unemployed and claimed he had no income or liquid assets. Hentges also owed Bank of America approximately $69,000 on numerous credit card accounts (directly and as guarantor of corporate cards) which he chose not to pay because he contended that he has an offsetting claim against Bank of America in the "wrongful garnishment" lawsuit.

## IV. Conclusions of law

■ Section 303(i) of the Bankruptcy Code provides—

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—
>
> (1) against the petitioners and in favor of the debtor for—
>
> (A) costs; or
>
> (B) a reasonable attorney's fees; or
>
> (2) against any petitioner that filed the petition in bad faith, for—
>
> (A) any damages proximately caused by such filing; or
>
> (B) punitive damages.

11 U.S.C. § 303(i). Counsel seeks fees pursuant to subsection (1) and Hentges seeks damages pursuant to subsection (2). Although many courts routinely award fees to an alleged debtor who prevails in obtaining the dismissal of an involuntary petition, "the plain language of the statute clearly contemplates that fees and costs will not be awarded in all cases, even though a party will ordinarily incur attor-

---

**14.** The Bank did not assert any theory or instrument under which Hentges might be liable for such costs other than his liability on the Guaranty.

**15.** Generally, "[p]ayments of a debtor's obligations by a third party are not treated as payment by the debtor himself." *In re Food Gallery at Valleybrook*, 222 B.R. 480, 488 (Bankr.W.D.Pa.1998), *quoting In re Knoth*, 168 B.R. 311, 317–18 (Bankr.D.S.C.1994); *see also H.I.J.R. Properties Denver v. Schideler (In re H.I.J.R. Properties Denver)*, 115 B.R. 275, 277–78 and n. 3 (D.Colo.1990). To the extent that Hentges's wife was paying obligations on which she was not jointly liable with Hentges, such debts should be deemed

debts that were not being paid by Hentges when due.

**16.** Although Hentges testified that no definite payment terms existed in connection with the Wiggs debt, the debt arose from remodeling work performed by Wiggs in March 2005, of which $9,000 remained unpaid and was due on the Petition Date. In light of Hentges's testimony that he is unemployed and is unable to pay Hodgson, Marks and the Bank, the Court must assume that he is also unable to pay the Wiggs debt. "[M]aking arrangements to extend payments is evidence of failure to pay debts as they become due." *Knoth*, 168 B.R. at 318 (quotations and citation omitted).

neys' fees in seeking to dismiss the petition." *Susman v. Schmid (In re Reid)*, 854 F.2d 156, 159 (7th Cir.1988). Whether fees should be awarded "is committed to the discretion of the [trial] court" (*id.*) and in determining whether to award fees, most courts employ a "totality of the circumstances" test. *See Higgins v. Vortex Fishing Systems, Inc.*, 379 F.3d 701, 706 (9th Cir.2004). The following circumstances have been found to be relevant to the evaluation of an involuntary debtor's request for fees: "1) 'the merits of the involuntary petition,' 2) 'the role of any improper conduct on the part of the alleged debtor,' 3) 'the reasonableness of the actions taken by the petitioning creditors,' . . . 4) 'the motivation and objectives behind filing the petition' . . . [and] other material factors [the court] deems relevant." *Higgins*, 379 F.3d at 707–08, *quoting In re Scrap Metal Buyers of Tampa, Inc.*, 233 B.R. 162, 166 (Bankr.M.D.Fla. 1999).

■ While there is no requirement that the Court find that the Petitioning Creditors filed the Amended Involuntary Petition in bad faith in order to award fees to the involuntary debtor (*Susman*, 854 F.2d at 160), the "motivation and objective" prong of totality of the circumstances test can be established by examining evidence of the petitioning creditors' good faith or bad faith. *Id.* ("the presence or absence of bad faith will inform the exercise of the . . . court's discretion under § 303(i)"). Thus, the Court will evaluate evidence presented by Hentges in support of his allegation that the Petitioning Creditors filed the Amended Involuntary Petition in bad faith, the result of which will inform its determination under both subsections of Section 303(i).

### A. *Bad faith*

The Tenth Circuit Court of Appeals has not had an occasion to develop criteria for determining whether an involuntary petition has been filed in bad faith. The Court finds recent Second Circuit and Eleventh Circuit cases instructive, however. *See Lubow Machine Co. v. Bayshore Wire Products Corp. (In re Bayshore Wire Products Corp.)*, 209 F.3d 100 (2d Cir. 2000) ("*Bayshore*"); *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485 (11th Cir.1997) ("*General Trading*"). In addressing the burden of proof, the *Bayshore* court stated "there is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." *Bayshore*, 209 F.3d at 105 (quotations and citations omitted).

After observing the absence of a statutory definition of bad faith, the Second and Eleventh Circuits surveyed the various approaches courts have employed in determining whether a petition was filed in bad faith for the purpose of evaluating a putative debtor's entitlement to damages under Section 303(i)(2). *Bayshore*, 209 F.3d at 105–06; *General Trading*, 119 F.3d at 1501–02. These include the "improper use" test, the "improper purpose" test, the "reasonable person" test, and the "Bankruptcy Rule 9011" test. *Id.* Because the putative debtors in the *Bayshore* and *General Trading* cases failed to prove that the petitioning creditors acted in bad faith under any of the tests, these courts declined to specify which approach or approaches were applicable in their respective circuits. This Court will evaluate Hentges's proffered evidence of bad faith in light of each approach articulated in these cases.

### 1. *Improper use test*

■ Some courts have concluded that a petition is filed in bad faith " 'when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a "disproportionate advantage" for

itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interest in a different forum.'" *Bayshore,* 209 F.3d at 105, *quoting In re K.P. Enterprise,* 135 B.R. 174, 179 n. 14 (Bankr.D.Me.1992), and *citing In re Better Care, Ltd.,* 97 B.R. 405, 410–11 (Bankr.N.D.Ill.1989); *see also General Trading,* 119 F.3d at 1501. Other courts have found improper use when a petitioner invokes bankruptcy as a substitute for bringing a collection action in state court. *See, e.g., Bankers Trust Co BT Service Co v. Nordbrock (In re Nordbrock),* 772 F.2d 397, 399 (8th Cir.1985) ("This case reflects efforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim, a practice condemned in prior decisions."); *In re Johnston Hawks Ltd.,* 72 B.R. 361, 364, 367 (Bankr.D.Haw.1987) (petitioners believed that the debtor was withholding consent to the release of escrowed funds, and rather than bring a breach of contract action, petitioners "attempted to use the Involuntary Petition ... as leverage in order to force ... a bonding company ... into agreeing to release certain funds from an escrow account in order to pay their claims"), *aff'd* 885 F.2d 875 (9th Cir.1989). Generally, courts will find an improper use of the bankruptcy mechanism in cases of a two-party (or two-faction) dispute over the control of property or an entity (*see, e.g., Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.),* 61 B.R. 614, 619 (9th Cir. BAP 1986) (filing bankruptcy without proper authorization on behalf of the corporation by one faction of owners/directors who were dissatisfied with a state court corporate dissolution proceeding pursued by other faction was improper use of bankruptcy); *In re ELRS Loss Mitigation, LLC,* 325 B.R. 604, 633 (Bankr.N.D.Okla. 2005) ("the only real effect of an involuntary bankruptcy would be to wrest control of Loss Mitigation away from Vargas"); *Better Care,* 97 B.R. at 412 (petitioner was "attempting to obtain control of the Better Care corporation")) or to gain another advantage *not available to other creditors* of the debtor (*see, e.g., Better Care,* 97 B.R. at 411 (petitioner was also improperly using the bankruptcy system to "redirect which creditors were paid first so as to reduce his liability on his guarantees")).

Hentges contends that because the Petitioning Creditors had adequate remedies under state law of which they failed to take advantage, their decision to file the Amended Involuntary Petition was an improper use of the bankruptcy system. Hodgson and Marks had already taken advantage of state remedies, however, by obtaining judgments through state court proceedings and attempting to collect using state law processes. Hentges asserts that Hodgson and Marks should have conducted an asset hearing before resorting to filing the involuntary petition. However, Marks already possessed information about Hentges's businesses and accounts from his testimony to the Insurance Commissioner, conducted an asset hearing in November 2005, and made a concerted effort to locate and seize assets for several months, but was unsuccessful. Hodgson also attempted to garnish accounts and was likewise unsuccessful.

Hentges also argues that the fact that Hentges offered to settle the debt to the Bank (on Hentges's terms) indicates that the Bank could have collected its debt outside the context of a bankruptcy proceeding. However, the Bank had sued Hentges in September 2005, and instead of paying the debt, answering and defending the lawsuit, or confessing judgment, Hentges dragged out settlement discussions for four months, first agreeing to settle, then refusing to execute documents

drafted by the Bank, then modifying payment terms and dates, and generally engaging in stalling tactics. By December 2005, the Bank had learned that Hentges owed sizable judgments to other creditors which would have reasonably diminished the Bank's confidence that Hentges would be able to comply with any settlement agreement.

 While it is true that these creditors had the option of continuing to proceed in Tulsa County District Court to attempt to collect on the judgments and guarantees, that fact, in and of itself, does not support an inference of bad faith. Creditors are justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to "insur[e] an orderly ranking of creditors' claims" and "to protect against other creditors obtaining a disproportionate share of debtor's assets." *Better Care*, 97 B.R. at 411. Creditors may also use the bankruptcy process to install a trustee to prevent future transfers or wasting or dissipation of assets or to investigate and to challenge the legitimacy of entities that may be operating as alter egos of a debtor. As of the Petition Date, Hentges was preferring other creditors to the Petitioning Creditors. Hentges chose to pay (or instructed his wife to pay) mortgages, utilities, taxes and insurance on two homes rather than pay the Petitioning Creditors. Hentges also transferred assets to his wife "to defray divorce." There is also evidence that Hentges had assigned his earnings to entities he controlled and had freely transferred assets between entities he controlled. Hodgson testified that he believed that Hentges himself had contemplated filing bankruptcy, and thus Hodgson reasonably believed that a trustee could force him to return any payments he ultimately recovered on his judgment.

Marks may have been motivated to file the involuntary petition in order to gain an advantage in the lawsuit Hentges filed against her and her attorneys (among others). Marks believes the lawsuit has no merit and that the lawsuit was filed in order to deter and discourage Marks from attempting to collect her judgment. *See* Motion to Dismiss First Amended Petition and Brief in Support, Marks Exhibit 4–29. If the involuntary petition had been successful, a Chapter 7 trustee would have been given an opportunity to evaluate the lawsuit and determine whether to pursue Hentges's claims on behalf of Hentges's bankruptcy estate. Although bankruptcy would have removed Hentges from control of his lawsuit, the Chapter 7 trustee would have had a duty to vigorously pursue the lawsuit for the benefit of the estate if the suit had merit. Thus, the Court cannot conclude that the substitution of the Chapter 7 trustee for Hentges as the plaintiff in the lawsuit would have given Marks any unfair or "disproportionate" advantage over Hentges's other creditors.

*2. Improper purpose test*

 Courts have found bad faith when "the filing of the petition was motivated by ill will, malice, or a desire to embarrass or harass the alleged debtor." *Bayshore*, 209 F.3d at 105, *citing In re Camelot, Inc.*, 25 B.R. 861, 864 (Bankr.E.D.Tenn.1982); *see also General Trading*, 119 F.3d at 1501.

 In his Reply, Hentges alleges the following as evidence of a "pattern of bad faith leading up to and including the wrongful filing of the involuntary petition": [17]

(1) That the Petitioning Creditors "[k]nowingly ma[de] false state-

---

17. Reply at ¶ 6.

ments to various licensing bodies in an effort to cause Mr. Hentges to lose those licenses on which he relied to earn a living." Reply at ¶ 6a. Hentges failed to establish this allegation at the hearing. Marks testified before the Hearing Officer regarding Hentges's conduct in inducing her, a client, to loan money. The Hearing Officer apparently found Marks credible. Absolutely no evidence was presented to this Court to support the allegation that she made false statements, knowingly or otherwise, to the Insurance Commissioner.[18] Further, there is a complete absence of evidence linking Hodgson or the Bank with the Insurance Commission proceeding or with any other licensing body.

(2) That the Petitioning Creditors made "[d]eliberate and very personal attacks on Mr. Hentges's business associates, friends and family with the intent to actively prevent Mr. Hentges from succeeding in his

business endeavors." Reply at ¶ 6b. Again, the evidence does not support this allegation. The Court finds the pre-petition conduct of the Petitioning Creditors to be wholly consistent with creditors employing legal processes to obtain payment of legitimate debts. No evidence whatsoever was presented tending to establish any "deliberate" "personal attacks" on "business associates, friends and family." Further, no evidence was presented that tended to show that any of the Petitioning Creditors subjectively desired to prevent Hentges from "succeeding in his business endeavors." The evidence supports a finding that Marks and Hodgson just desired to be paid and aggressively exercised their rights to discover assets to satisfy valid judgments.[19]

(3) That the Petitioning Creditors committed "[e]xtortion." Reply at ¶ 6c. Hentges presented no evidence of extortion by any of the Petitioning Creditors.

---

18. Hentges argues that Marks erroneously reported to the Insurance Commissioner that she loaned money to Hentges individually when she actually loaned money to entities controlled by Hentges. The distinction is immaterial, however. The Hearing Officer found that Hentges misused his relationship as Marks's insurance agent and financial advisor to induce Marks to make the loans for "his benefit and that of his business ventures." Marks Exhibit 5 at ¶ 5, 8. Thus, the identity of the actual recipient of the funds was not relevant to the Hearing Officer's conclusion that Hentges improperly took advantage of his relationship with Marks.

19. At the hearing, Hentges testified that he suspected that Marks filed the involuntary petition in order to cause a default on a business transaction with Richard Lowry. The REMS account that was garnished by Marks was an escrow account that contained funds deposited by Lowry in connection with a transaction with Hentges-related entities.

Hentges claimed that within two weeks after Lowry's counsel provided Marks's counsel with documentation of the transaction (in connection with Lowry's objection to Marks's garnishment of the funds), Marks filed the Amended Involuntary Petition. Hentges contends that Marks filed the involuntary petition in order to force him into default, apparently under *ipso facto* default clauses contained in the transaction documentation.

Because the Court finds that Marks genuinely desires to collect her judgment, it is implausible that she would seek to intentionally cause Hentges to default on any transaction that might generate funds that could be attached or that might cause Hentges to be liable to additional competing creditors. Thus, the Court rejects the link Hentges attempts to draw between Marks's receipt of transaction documents and her decision to file the involuntary petition.

(4) That the Petitioning Creditors "claim[ed] in this Court that an unsatisfied debt allowed a petitioner to file an involuntary bankruptcy petition against Mr. Hentges while, at the very same time, claim[ed] in another court that funds held by that court's process would fully satisfy the debt claimed." Reply at ¶ 6d. While it is true that Marks made a claim to the $185,000.00 of the REMS escrow account that had been segregated by Bank of America in response to the garnishment Marks served on Bank of America, the garnishment was in dispute, third parties made claims to the funds, and it was far from clear that Marks would be successful in recovering those funds. There is no dispute that Marks's judgment was *unsatisfied* as of the Petition Date.

(5) That the Petitioning Creditors "[f]alsely publish[ed] that Mr. Hentges had filed bankruptcy as a 'voluntary' matter." Reply at 6e. Hentges claims that publication of the filing by the Tulsa World newspaper had to be the work of the Petitioning Creditors because (1) he did not believe the Tulsa World had ever previously reported an individual's bankruptcy and (2) the Tulsa World stated that Hentges was *pro se* and that only the Petitioning Creditors knew that he was planning to represent himself. The Court takes judicial notice of the fact that the Tulsa World routinely reviews bankruptcy case filings and publishes in its Sunday business section information on those cases involving businesses and individuals who own or operate businesses. Further, the Court takes judicial notice that until an attorney enters an appearance on behalf of a debtor, the Court's dock-

et sheet will reflect that a debtor is *pro se*. That information is available on the internet to anyone with a PACER account. Because no attorney entered an appearance for Hentges until the day before the trial, the docket sheet would have reflected that Hentges was *pro se* at the time of the Tulsa World's publication. There was absolutely no evidence that any of the Petitioning Creditors had any contact with the Tulsa World.

(6) That the Petitioning Creditors "[c]onceal[ed] from this Court at the time of filing that a settlement had been reached with [the Bank] which was agreed upon as to all terms with the exception of the timing of the payments." Reply at 6f. As set forth above, the Court finds insufficient evidence of an enforceable settlement between MEH, Inc. and the Bank and no evidence that the proposed settlement would have exonerated Hentges's liability on the Guaranty. Thus, the Petitioning Creditors' statement in the Amended Involuntary Petition that the Bank had a "claim" against Hentges was accurate.

(7) That the Petitioning Creditors "[m]isrepresent[ed] that the [Bank's] alleged debt was actually a judgment." Reply at 6g. The original involuntary petition stated that the Bank had a judgment. The Amended Involuntary Petition, filed the next day, corrected the error and indicated that the Bank had a "claim." The Amended Involuntary Petition was served on Hentges. The Court will not infer bad faith from a harmless mistake that was immediately corrected.

(8) That the Petitioning Creditors "[u]sed this Court's process for the sole or primary purpose of embarrassing and disparaging Mr. Hentges among those individuals with whom he was seeking to develop business relationships." Reply at 6h. No evidence was presented that any particular person chose not to do business with Hentges because of the involuntary bankruptcy proceeding.

Hentges also claimed that because Marks rejected his "offer to pay her in full with interest" as represented by the June 2005 Northrop Letter, she must have been motivated by something other than a desire to be paid. In fact, Hentges did not offer to pay Marks in full with interest; instead, he offered to cancel the existing notes and recalculate the debt with a lower interest rate and execute a new three year note. This is hardly an offer to pay Marks in full with interest. Since Hentges had not paid the existing notes when due, and had previously engaged in delaying tactics, Marks was justified in rejecting the offer and in choosing to reduce the existing notes to a judgment. This choice was not inconsistent with a good faith desire to collect a debt.

### 3. Reasonable person test

 The "reasonable person" test focuses not on the subjective intent of the petitioning creditors, but on whether a reasonable person would find the actions of the petitioning creditors to be in bad faith. *Bayshore*, 209 F.3d at 105–06, *citing Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.)*, 61 B.R. 614, 620 (9th Cir. BAP 1986).

The Court concludes that a reasonable person would not find that the actions of the Petitioning Creditors constituted bad faith. As set forth above, the Petitioning Creditors had attempted through various legal processes to collect valid, enforceable debts and were unsuccessful and, in the case of Marks, got sued for the efforts. A reasonable person would suspect that Hentges, who in June 2005, executed a financial statement representing that he owned approximately $2.6 million in assets, would have some assets available to satisfy the debts, which, if not discovered after reasonable employment of state law means, might be recoverable by a trustee in a bankruptcy proceeding.

### 4. Bankruptcy Rule 9011 test

 An inquiry under Bankruptcy Rule 9011 in connection with the filing the involuntary petition synthesizes the essence of the three previous tests. Under Bankruptcy Rule 9011, an attorney or party is representing that—

to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal or existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bank. P. 9011(b). In applying this approach, a court must evaluate the petitioning creditors' subjective motivation in filing the petition (to test for an "improper purpose" such as harassment or embarrassment of the alleged debtor) and the strength of the petitioning creditors' legal and factual basis for filing the involuntary petition based upon what a reasonable person would have done or believed under the circumstances (requiring an objective review of the evidence).

The Court has already concluded that the Petitioning Creditors did not file the Amended Involuntary Petition "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation."

The Court also concludes that the Petitioning Creditors had a reasonable basis for believing that the facts and existing law supported the Amended Involuntary Petition. It is undisputed that Marks and Hodgson had valid unstayed judgments and the Bank had a valid claim. With respect to the Bank's claim, as of the Petition Date, Hentges had not answered or otherwise defended against the Petition on Guaranty, and thus there was evidence that his liability on the debt was not in *bona fide* dispute. Hentges agreed that MEH, Inc., whose debt he unconditionally guaranteed, owed the Bank (although the amount was in dispute) and Hentges was attempting to negotiate a payment plan with the Bank. None of the Petitioning Creditors' debts were being paid, although the debts were due. Thus, the Petitioning Creditors' allegations and factual contentions had evidentiary support.

Moreover, the Petitioning Creditors were justified in believing that they were qualified as petitioning creditors under existing law. The Petitioning Creditors' position that the Bank qualified as a petitioning creditor even though one component of its claim may have been in dispute was one legitimate reading of the statute and existing case law. Prior to the enactment of Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Section 303(b)(1) provided that an involuntary petition may be commenced "by three or more entities, each of which is ... a holder of a claim against such person that is not contingent as to liability or the subject of a *bona fide* dispute, ... if such claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims...." 11 U.S.C. § 303(b)(1) (pre-BAPCPA). Pursuant to that provision, courts widely held that a dispute as to a portion of a petitioning creditor's claim did not disqualify the creditor as a petitioning creditor under Section 303 of the Bankruptcy Code. *See, e.g., Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.)*, 378 F.3d 916, 926 (9th Cir.2004) (" '[I]f at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to bona fide dispute' "), *quoting IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474, 479 (W.D.Pa.1995), *aff'd* 85 F.3d 612 (3d Cir. 1996); *see also In re Food Gallery at Valleybrook*, 222 B.R. 480, 489 (Bankr. W.D.Pa.1998); *In re Willow Lake Partners II, L.P.*, 156 B.R. 638, 643 (Bankr. W.D.Mo.1993) (creditor is qualified to be a petitioning creditor "even though a portion of the creditor's claim is the subject of a bona fide dispute, where the undisputed portion of the claim is not contingent as to liability"), *citing In re Broadview Lumber Co.*, 137 B.R. 775, 776 (Bankr.W.D.Mo. 1992); *In re F.R.P. Industries, Inc.*, 73 B.R. 309, 312 (Bankr.N.D.Fla.1987); *In re Onyx Telecommunications, Ltd.*, 60 B.R. 492, 498 (Bankr.S.D.N.Y.1985).

On April 20, 2005, BAPCPA's amendments to Section 303 became effective. Amended Section 303(b)(1) provides that an involuntary case may be commenced "by three or more entities, each of which is . . . a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute *as to liability or amount* . . . if such claims aggregate at least $12,300 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims. . . ." 11 U.S.C. § 303(b)(1) (effective April 20, 2005) (emphasis added). The Petitioning Creditors correctly argued that only two reported cases address the post-BAPCPA language of Section 303(b)(1). The bankruptcy court in *In re Dilley*, 331 B.R. 1 (Bankr.D.Me.2005), *rev'd* 339 B.R. 1 (1st Cir. BAP 2006), stated, in dicta, that the post-BAPCPA language did not disqualify a petitioning creditor whose claim was partially disputed and partially undisputed. *Id.* at 5 (citing pre-BAPCPA cases in support of proposition that "qualification of an entire claim may not be required. A portion of a claim may suffice.").[20] The other post-BAPCPA case interpreting Section 303(b)(1) emanated from this district. In *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604 (Bankr.N.D.Okla.2005), Judge Terrence Michael found that because approximately $28,000 of a petitioning creditor's approximately $83,000 claim arising from an employment agreement was objectively undisputable, the creditor held an undisputed claim in excess of $12,300 and was therefore a qualified petitioning creditor. *Id.* at 626–27. Although Judge Michael recognized that the post-BAPCPA

Section 303(b) was applicable to the case, *id.* at 610, n. 2, he did not specifically address the BAPCPA amendment to Section 303(b) in connection with his determination that the creditor's claim could be bifurcated into component parts for the purpose of determining whether there was a *bona fide* dispute as to the amount of the claim.

Although this Court did not follow the *Dilley* and *ELRS* courts, the Petitioning Creditors had no way of predicting how this Court would interpret the post-BAPCPA Section 303(b). Judicial interpretation of the amended "*bona fide* dispute" provision is sparse and until the Tenth Circuit or United States Supreme Court provide guidance, its meaning will remain unsettled. Thus, as demonstrated by the divergent application of amended Section 303(b)(1) by this Court and the *Dilley* and *ELRS* courts, the Bank's eligibility as a petitioning creditor was a "close question," and had this Court followed *Dilley* and *ELRS*, the Amended Involuntary Petition would not have been dismissed on account of a *bona fide* dispute as to the amount of the Bank's claim. Thus, the Court concludes that the Petitioning Creditors' legal position was "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal or existing law or the establishment of new law."

### 5. Conclusion as to bad faith

None of the four approaches yields a conclusion that the Petitioning Creditors acted in bad faith in filing the Amended Involuntary Petition. Accordingly, Hentg-

---

**20.** The bankruptcy court in *Dilley* ultimately dismissed the involuntary petition on the ground that the putative debtor had placed a claim for wrongful death in *bona fide* dispute by pleading not guilty to the murder charges arising from the same conduct. The bankruptcy appellate panel reversed the bankruptcy court's dismissal of the petition and re-

manded the matter to the bankruptcy court, holding that because the putative debtor's not guilty plea (or even an acquittal) would have no preclusive effect on the civil claim due to the differing standards of proof, the plea of not guilty to a criminal charge did not put the civil claim in *bona fide* dispute. *See In re Dilley*, 339 B.R. 1 (1st Cir. BAP 2006).

es is not entitled to damages under Section 303(i)(2); therefore, no further hearing on damages is necessary.

### B. *Fees*

■ Capron seeks attorney fees of $11,240.00 for the period of December 22, 2005 through March 27, 2006, and Northrop seeks fees of $1,800.00 for the period of December 23, 2005, through February 6, 2006. The Court cannot adequately evaluate the reasonableness of Northrop's services or fees because his billing statement, which is attached to the Application, fails to itemize the date of each service or the amount of time devoted to each service. Further Northrop did not appear at the hearing to address these deficiencies. The Court will not engage in speculation as to the necessity of the services or the reasonableness of the fee charged therefor in absence of sufficient evidence. Therefore, Northrop's request for fees is denied.

■ With respect to Capron's fees, the Court concludes that based on the totality of the circumstances, Capron's request should also be denied. In so concluding, the Court has considered "1) 'the merits of the involuntary petition,' 2) 'the role of any improper conduct on the part of the alleged debtor,' 3) 'the reasonableness of the actions taken by the petitioning creditors,' . . . 4) 'the motivation and objectives behind filing the petition' . . . [and] other material factors [the court] deems relevant." *Higgins,* 379 F.3d at 707–08, *quoting In re Scrap Metal Buyers of Tampa, Inc.,* 233 B.R. 162, 166 (Bankr.M.D.Fla. 1999).

■ The Court has determined that the Petitioning Creditors were justified in believing that they were qualified as petitioning creditors under existing law and that their petition had merit. The Petitioning Creditors' position that the Bank qualified as a petitioning creditor because almost $30,000 of its $39,000 claim was undisputed was one legitimate reading of the statute and existing case law, and although the Court did not adopt the Petitioning Creditors' position, as explained above, it was a close question. When the dismissal of the petition was a "close question," a court is particularly justified in refusing to award fees to the involuntary debtor. *See Susman,* 854 F.2d at 160; *see also Higgins,* 379 F.3d at 708 (fees were awarded in part because petitioning creditors "lost squarely on the merits and . . . [l]osing was not a close call" (internal quotations omitted)); *Scrap Metal Buyers,* 233 B.R. at 166 ("The closer the question of dismissal, the less likely it may be appropriate to award counsel fees." (quotations and citation omitted)). In light of the *ELRS* case, if the petition had been assigned to the other bankruptcy judge in this district, the Petitioning Creditors may have prevailed.

Further, the above-stated findings and conclusions concerning bad faith establish that the Petitioning Creditors did not have an improper motive or objective for filing the Amended Involuntary Petition and that the Petitioning Creditors acted reasonably in pursuing alternative remedies prior to filing the petition.

The Court unfortunately must conclude that Hentges and Counsel are not blameless in the events that led to the Petitioning Creditors' decision to file the Amended Involuntary Petition. Hentges breached duties to Marks, threatened that he would not pay her if she sued for repayment, eventually consented to a judgment, and then sued Marks for attempting to collect the agreed judgment. Hentges's conduct toward his client, Marks, went from bad (using knowledge of her financial status for the benefit of himself and his companies) to worse (blame, threats and retaliatory lawsuits). Notwithstanding that he pro-

fessed to earn several hundreds of thousands of dollars a year (prior to losing his license to sell insurance), Hentges refused to pay Hodgson for debts that were due and owing since 1997. After defaulting on these obligations, Hentges transferred his income and other assets to his wife or other entities and transferred assets between entities. The totality of these circumstances leads to the conclusion that Hentges's creditors would benefit from a thorough and independent investigation of Hentges's financial affairs, and the affairs of entities controlled by Hentges, that could occur in a bankruptcy proceeding.

The Court did not find Hentges's testimony at trial or at the hearing particularly credible and the Court does not believe Hentges has been dealing with his creditors fairly and in good faith. The Court further finds that allegations and arguments made by Hentges and Counsel in these proceedings too often turned out to be without factual or legal bases.[21]

For these reasons, the Court declines to award fees to Counsel pursuant to Section 303(I)(1).

## V. Conclusion

The Application of Counsel of Involuntary Debtor for Compensation and Reimbursement of Attorneys' Fees is denied in its entirety.

**SO ORDERED** this 18th day of April, 2006.

---

**21.** For instance, Capron's argument that Hentges's liability on the Guaranty was exonerated by the Bank's extension of the notes had no legal basis. His argument that Marks Exhibit 5 was not properly authenticated had no legal basis. His contention that Hentges offered to pay Marks in full with interest before she sued on the Notes was disingenuous, as Hentges merely proposed to trade the existing Notes for notes with lower interest rates. Most of the allegations made to establish bad faith were not supported with admissible evidence. Capron stretched the boundaries of zealous advocacy without regard to his duties of candor to the Court or his obligations under Rule 9011.